UNITED STATES of America upon the relation and for the use of the Tennessee Valley Authority, Plaintiff,

v.

AN EASEMENT AND RIGHT-OF-WAY OVER 6.09 ACRES OF LAND, MORE OR LESS, IN MADISON COUNTY, ALABAMA, and Moores Mill Communities, LLC, et al., Defendants.

United States of America upon the relation and for the use of the Tennessee Valley Authority, Plaintiff,

v.

An Easement and Right-of-Way over 1.04 Acres of Land, More or Less, in Madison County, Alabama, and Fanning School Communities, LLC, et al., Defendants.

No. 5:14–cv–0032–JEO, No. 5:14–cv–0048–JEO

United States District Court, N.D. Alabama, Northeastern Division.

Signed October 21, 2015

Edward C. Meade, Frances Regina Koho, Tennessee Valley Authority, Knoxville, TN, for Plaintiff.

Elizabeth L. Blair, Harlan Irby Prater, IV, David R. Pruet, III, Lightfoot Franklin & White LLC, Birmingham, AL, Joseph M. Cloud, Joseph M. Cloud, PC, Huntsville, AL, for Defendants.

## MEMORANDUM OPINION & ORDER

JOHN E. OTT, Chief United States Magistrate Judge

Acting upon the relation and for the use of the Tennessee Valley Authority ("TVA"), the United States (hereinafter the "Government") filed these two condemnation actions pursuant to FED. R. CIV. P. 71.1 and the Tennessee Valley Authority Act of 1933, as amended, 16 U.S.C. § 831–831ee. In connection therewith, the Government has condemned an easement and a right-of-way over adjoining parcels of real property located in Madison County, Alabama. In one case, 5:14–cv–0032–JEO (the "Moores Mill Case"), the parcel is owned by defendant Moores Mill Communities, LLC ("MMC"). In the other case, 5:14–cv–0048 (the "Fanning Case"), the parcel is owned by defendant Fanning School Communities, LLC ("FSC"). The two cases have been consolidated, with the parties reserving the right to seek separate trials (Doc. 34; Fanning Case Doc. 35) [1], and the parties have consented to the exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. (Doc. 23, ¶ 4(H); id. Docs. 33–1, 33–2; Fanning Case Doc.

34). Now before the court are the Government's substantially identical motions in limine in each case, which seek to preclude MMC and FSC (collectively "Defendants") from offering at trial portions of the testimony of Defendants' retained expert or any opinions from two of Defendants' principals on the value or the highest and best use of the land. (Doc. 37; Fanning Case Doc. 39). The parties have briefed the motions and filed evidentiary materials in support of their respective positions. (Docs. 38, 41, 45; Fanning Case Docs. 40, 43, 46) [2]. Upon consideration, the court concludes that the Government's motions in limine are due to be granted in part and denied in part.

### I.

Wayne Bonner, Jeff Enfinger, and Bland Warren are principals of both Defendant entities. In August 2006, Defendant MMC entered into a Development Agreement with the owners of approximately 407 acres of raw land in unincorporated Madison County (the "Moores Mill tract"), with the parties declaring their intent that the land would be developed according to a site plan to be created by MMC. (Doc. 41–5 ("Development Agreement") ¶ 2). Pursuant to the Development Agreement, MMC paid the sellers $2 million at the closing in January 2007 and promised to pay an additional 20% of the net price of each residential lot as it was

1. Citations to "Doc(s) ——" are to the document numbers of the pleadings, motions, and other materials in the designated court file in the Moores Mill Case, as compiled and numbered by the Clerk on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system. Citations to "Fanning Case Doc(s) ——" are to the document numbers of the materials in the Fanning Case. Pinpoint citations to deposition testimony is the page of the transcript. Unless otherwise noted, pinpoint citations for all other documents are to the page of the electronically

filed document, which may not correspond to the pagination on the original "hard copy."

2. Because the Government's motions in limine in these consolidated case are identical or substantially so, the court's citations to the parties' motions and the associated briefs and evidence will be only to the relevant document in the Moores Mill Case, with the understanding that corresponding material has also been filed in the Fanning Case.

developed and sold by MMC. (Development Agreement ¶ 5(a)). MMC, however, also reserved the right to sell any or all of the property as undeveloped land. (Id.) For any such sales, MMC would pay the owners the greater of either 33% of the net sale price or a per-acre amount that increased over time, from $10,000 for closings through February 14, 2007, to $18,200 for closings occurring during calendar 2016. (Id.) And finally, if any of the Moores Mill tract were to remain undeveloped on December 31, 2016, MMC would be obligated to buy it from the owners for an additional $18,200 per acre. (Id.)

In 2007, Defendant FSC purchased an adjoining 80–acre tract to the northwest of the Moores Mill tract. The two properties together formed an approximately 480–acre rectangle, bounded on the west by a section of Moores Mill Road, a two-lane thoroughfare also designated as County Road 53, running north/south. Moores Mill Road also marked the southern boundary of the Moores Mill tract, after having taken a 90–degree easterly turn upon meeting with Steger Road. (See Doc. 38–2 at 20, 59; Doc. 38–14 at 9, 25, 28).

In the period leading up to the purchases and in the year or so afterwards, Defendants took a number of preliminary steps under the Development Agreement and otherwise towards developing the properties as a residential subdivision. Such steps included evaluation of a soils map and having certain environmental assessments and surveys performed to map topography and to determine whether any areas were wetlands or in a floodplain. Defendants hired an engineering firm to create a site master plan with over 1,200 residential lots to be developed in several phases, and Defendants created proposed schedules for completing phases and a cash flow analysis for the project, based on projected annual lot sales. They also con-ducted a sewer availability analysis, entered into a sewer service agreement, and commissioned a survey to analyze the property for wetlands and flood plains and map topography. In late 2007 and early 2008, Defendants also compiled a marketing catalog for the property that included a plan that incorporated a lot reserved for commercial development at the southwest corner of the Moores Mill tract. (See Docs. 41–2, 41–3, 41–4).

In about the spring of 2008, however, the financial crisis hit. Defendants' plans were put on hold indefinitely as the recession dragged on and the real estate market continued to sag. Nothing material appears to have occurred for several years until, in November 2011, FSC entered into a land swap agreement with the Madison County Board of Education ("BOE"). Under that agreement, FSC traded about a 25–acre rectangular lot in the northwest corner of the Fanning tract to the BOE for the purpose of having it build a school there. The BOE later did just that, and it opened the Moores Mill Intermediate School on the site in August 2014. Following the swap, FSC was left with an approximately 55–acre tract (the "Fanning tract") adjoining the Moores Mill tract. According to Defendants, FSC agreed to the trade for a similarly sized piece of property elsewhere because they believed the addition of a nearby school would make the planned residential development more attractive to families and add value to the Fanning and Moores Mills tracts on the whole.

In about January 2012, however, TVA notified Defendants that TVA intended to condemn an easement on the subject properties for the purpose of erecting and maintaining electric transmission lines. According to Defendants, TVA revised its plans for the location of the power line easement several times throughout 2012

and 2013, during which Defendants tried to convince TVA to locate the lines elsewhere. Those efforts failed, however, and TVA eventually finalized the location of its power line easement: a 100–foot–wide strip starting about 25 feet inside and running essentially parallel to Moores Mill Road on the western edge of each tract. The easement would start in the north at the BOE property line of the Fanning tract and run south onto the Moores Mill tract, with a "dog leg" to the southeast as the easement approaches the Steger Road intersection. (Doc. 38–2 at 23; Doc. 41–6 at 18). When the parties were unable to agree as to the amount of just compensation, the Government filed the Moores Mill Case with a declaration of taking on January 8, 2014, condemning a permanent easement and right-of-way over 6.09 acres on the Moores Mill tract. (Docs.1, 2, 3). The next day, the Government filed the Fanning Case with a declaration of taking, similarly condemning a permanent easement and right-of-way over 1.04 acres on the Fanning tract. (Fanning Case Docs. 1, 2, 3).

It is undisputed that Defendants have not sold, improved, or developed any of the land on either the Moores Mill tract or the Fanning tract, either before or since the takings. Instead, the properties have continued to be leased year-to-year as farmland. And since their early efforts in 2007 and early 2008, Defendants have not done anything else towards actually subdividing, improving, or selling any of the land. In particular, no lots have been staked out, and no subdivision plat has been recorded or submitted for approval by the County Planning Commission. Nor have Defendants installed any sewer, water, or utility hook ups. Defendants claim, however, that they were effectively prevented from developing or selling the land ever since becoming aware in 2012 of TVA's intention to take an easement because Defendants were uncertain where the easement would be located. And they claim that, even after the location of the easements was fixed by the takings in January 2014, they have still been unable to proceed because, they say, until it is determined how much compensation they will receive in this litigation, they cannot perform the financial analysis required to apply to banks for the financing they will need to develop the land.

## II.

### A.

■ Under the Takings Clause of the Fifth Amendment, "private property shall not be taken for public use, without just compensation." U.S. Const. amend. V. The instant cases revolve around the question of what amount of compensation is "just" for the Government's condemnation of the respective power line easements taken on the Moores Mill tract and the Fanning tract. "The [Supreme] Court has explained that the underlying principle is that the dispossessed owner 'is entitled to be put in as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more.'" *United States v. 320.0 Acres of Land, More or Less in Monroe Cnty., State of Fla.*, 605 F.2d 762, 780 (5th Cir. 1979)[3] (quoting *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)); *see also A.A. Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 583 (11th Cir.2001). The burden at trial of establishing the amount of just compensa-

**3.** The decisions of the United States Court of Appeals for the Fifth Circuit handed down before October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

tion for a taking is on the landowner. *United States v. 8.41 Acres of Land, More or Less, Situated in Orange Cnty., State of Tex.*, 680 F.2d 388, 394 (5th Cir.1982); *United States v. Smith,* 355 F.2d 807, 809 (5th Cir.1966).

When the property interest taken from a parent tract is a permanent easement, as here, the proper measure of damages is the difference in between the market value of the land free of the easement and the value as encumbered, as of the date of the taking. *United States for Use of TVA v. Robertson,* 354 F.2d 877, 880 (5th Cir.1966); *see also United States v. 158.24 Acres of Land, More or Less, in Bee Cnty., Tex.,* 515 F.2d 230, 232 (5th Cir.1975); *United States v. 8.41 Acres of Land,* 680 F.2d at 392. Also, if a partial taking reduces the market value of the remainder of the parent tract, the owner is entitled to additional compensation for that diminution, which is loosely known as "severance damages." *See United States v. Miller,* 317 U.S. 369, 376, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *United States v. 101.88 Acres of Land, More or Less, Situated in St. Mary Parish, State of La.,* 616 F.2d 762, 768–69 (5th Cir.1980); *United States v. 2,997.06 Acres of Land, More or Less, in Marion Cnty., State of Fla.,* 471 F.2d 320, 335 n. 16 (5th Cir.1972).

Market value is defined as the price that a willing buyer would pay a willing seller in cash. *United States v. 480.00 Acres of Land,* 557 F.3d 1297, 1306–07 (11th Cir.2009); *Alabama Power Co. v. FCC,* 311 F.3d 1357, 1368 (11th Cir.2002). That is, "the price that the property would bring when offered for sale by one who wants to sell but is not forced to sell, and sought by one who would like to buy but is not required to buy, with the seller being allowed a reasonable time to find a purchaser." *United States ex rel. TVA v. Harralson,* 43 F.R.D. 318, 319 (W.D.Ky.

1966). "Market value is not, of course, a quality which inheres in the property itself, but is rather a reflection of the state of mind of the public with respect to the property." *Smith,* 355 F.2d at 809. It generally excludes, however, frustration of contract rights or opportunities, lost profits, or any other value that the land might have that is specific or subjective to the condemnee. *See United States v. 50 Acres of Land,* 469 U.S. 24, 35–36, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984); *United States ex rel. TVA v. Powelson,* 319 U.S. 266, 281–82, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *A.A. Profiles,* 253 F.3d at 585; *United States ex rel. TVA v. Easement & Right of Way 100 Feet Wide Over Certain Lands in Gibson Cnty., Tenn.,* 447 F.2d 1317, 1319–20 (6th Cir.1971).

However, "since a hypothetical, 'reasonable man' buyer will purchase land with an eye to not only its existing use but to other potential uses as well, fair market value takes into consideration '(t)he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future ... to the full extent that the prospect of demand for such use affects the market value while the property is privately held.' " *320.0 Acres of Land,* 605 F.2d at 781 (quoting *Olson,* 292 U.S. at 255, 54 S.Ct. 704); *see also A.A. Profiles,* 253 F.3d at 583. The highest and best use of a parcel is "the reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." *Lost Tree Vill. Corp. v. United States,* 787 F.3d 1111, 1118 (Fed.Cir.2015). "The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect mar-

ket value." *Olson*, 292 U.S. at 256, 54 S.Ct. 704. It is presumed, however, that the actual use of the land is also its highest and best, "because economic demands normally result in an owner's putting his land to the most advantageous use." *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir.1962). The burden at trial of establishing a highest and best use other than the existing use is on the landowner. *320.0 Acres of Land*, 605 F.2d at 826. Further, courts in this circuit have an obligation "to screen the proffered potential uses and exclude from the jury's consideration evidence those which have not been demonstrated to be practicable and reasonably probable uses." *Id.*, 605 F.2d at 815. That is, the court is to exclude evidence of proposed future uses unless the landowner makes a preliminary, prima facie showing that such "use [is] practicable and that there [is] reasonable likelihood that the land would be so used in the reasonably near future." *Id.*, 605 F.2d at 814.

### B.

Defendants have disclosed in discovery that they intend to solicit opinions from three witnesses as it relates to highest and best use of the two tracts and their diminished value. First, Defendants have produced a report pursuant to Fed. R. Civ. P. 26(a)(2)(B) from a retained expert, Scott B. Maddox, a certified real estate appraiser. (Doc. 38–2). Maddox's initial report is based upon an appraisal dated November 10, 2014, which opined that the just compensation for the taking is $827,000.00. (*Id.* at 3). In arriving at that figure, Maddox made the following loss-value determinations and added them together:

(1) $340,000 (rounded from 5.22 acres @ $65,000 per acre) for the inability to develop a proposed "commercial corner" lot on the southwest corner of the Moores Mill tract, where Moores

Mill Road meets Steger Road (*see id.* at 33);

(2) $426,000 for the inability to develop 28 proposed residential lots on the western edge of the tracts, along Moores Mill Road where the power lines are located, based on an assumption that such lots would be sold at an average price of $20,000 each over a period of 2.25 years (*id.* at 39); and

(3) $61,000 for the inability to develop a 5.1–acre "buffer" area between the power lines and the first line of proposed residential development to the east. (*Id.* at 40).

On January 2, 2015, Maddox issued a supplemental expert report. (Doc. 38–13). Maddox acknowledged therein that he had made a miscalculation in his original report as it related to the location of the buffer relative to the easement, which resulted in an increase in the size of the buffer on the remainder from 5.1 acres to 12.74 acres. (*Id.* at 2). That translated to an increase in Maddox's opinion on the loss attributed to the buffer from $61,000 to $153,000; and correspondingly bumped his assessment of just compensation by the same amount, from $827,000 to $919,000. (*Id.* at 4, 7).

Defendants also disclosed that two of their principals, Enfinger and Warren, may offer opinions on highest and best use and on damages (*See* Doc. 38–11 at 5). Defendants indicated that such opinions would be

based on their experience and observations as developers; their familiarity with residential and commercial development markets in Northern Alabama; their familiarity with the process through which such developments are designed, marketed, and sold; their familiarity with the subject property; and their familiarity with the purpose for

which the subject property was acquired.

(Doc. 38–4 at 4; *see also* Doc. 38–11 at 5 (supplemental disclosure stating that Enfinger and Warren's opinions were "based on their familiarity with the subject parcels, their experience developing land, and their familiarity with land values."). In their disclosures, Defendants calculated their combined damages associated with the takings on the Moores Mill tract and the Fanning tract at $1,824,533, comprising the sum of the following:

(1) a $522,000 loss (5.22 acres @ $100,000 per acre) associated with the inability to develop the "commercial corner" of the Moores Mill tract;

(2) a $615,630 loss for the 28 proposed residential lots on the western edge of the tracts, at a projected sale price of $32,500 per lot, with sales spread over 2.25 years;

(3) a loss of $254,752 as it relates to the development of 26.89 acres that would serve as a buffer area between power lines and proposed residential lots to the east; and

(4) $432,152 for "delays caused by the TVA," specifically including "interest payments that [Defendants] have been required to make pending the TVA's final decision as to the location of the transmission lines and pending [Defendants'] receipt of compensation for the damages they have suffered" (Doc. 38–11 at 7).

(*See also* Doc. 38–11 at 13, 15, 17, 21–22).

Enfinger also testified at his deposition about some of these calculations and related opinions about lost market value. He stated, for example, that the loss related to the inability to develop the commercial corner is as set forth above and that, in his estimation, the market value for the 28 lots on the western edge of the property is between $30,000 and $50,000 per lot. With regard to the "buffer" area to the east of the 28 hypothetical residential lots, Enfinger estimated that the land was worth about $15,000 per acre. (*See* Doc. 38–11 at 6; Doc. 38–9, Deposition of Jeffrey Enfinger ("Enfinger Dep.") at 148–49, 158). He further submitted that the first 200 feet from the transmission lines, comprising about 7.08 acres, have lost 100% of their value, while the next 350 feet, comprising about 19.82 acres, have lost about 50% of their value. (*Id.* at 159).

Like Defendants, the Government also retained a certified appraiser, Richard D. Pettey, to testify as an expert on its behalf. Pettey, however, takes a different approach than Defendants' witnesses to calculating diminished value. Pettey produced two separate expert reports, one for the Moores Mill tract and the for the Fanning tract, but only the former appears to be included in the record thus far. (Moores Mill Case Docs. 38–14, 38–15, 38–16, and 38–17). In any event, Pettey initially examined the characteristics of the Moores Mill tract and concluded that, given present market demand, its only financially feasible use for the immediately foreseeable future is agricultural but that a purchaser would still make a bid in consideration of the land having a "long term [h]ightest and [b]est use . . . for residential development." (Doc. 38–16 at 5). Pettey then looked to five sales of area property that he deemed comparable, leading him to conclude that the Moore's Mill tract was worth $7,500 per acre, or $3,055,950 for all 407.46 acres, before the taking. (*See* Doc. 38–15 at 11–30, Doc. 38–16 at 1–5). To find the post-taking diminution in value, Pettey first adjusted the value of the entire tract based upon the estimated amount required to construct two short access roads across the easement from Moores Mill Road. Petty explained that a potential purchaser would factor that cost,

approximately $60,500, into a bid for the subject tract because such access points would be viewed as necessary for future residential development. (Doc. 38–16 at 17). As a result, he reduced the value of the entire 400–plus acres after the taking by 2%, to $7,350 per acre. (*Id.*) From there, Petty opined that the taking further reduced by 96% the value of both the 6.09–acre easement and an additional 2.79–acre "uneconomic remnant"[4] between the western boundary of the easement and Moores Mill Road, to $294 per acre ($7,350 × .04), or $2,611 for those 8.88 acres. (Doc. 38–16 at 14, 17, 20, 21). Next, looking to other developments in the area with residential lots backing up to a TVA power line easement, Pettey rejected that there was any additional damage to the remainder as it might relate to a buffer for any similar long-term development on the Moores Mill tract. (Doc. 38–16 at 22–29, Doc. 38–17 at 1–21). Pettey therefore considered the remaining 398.58 acres to retain their per-acre value of $7,350, making them worth $2,929,563 after the taking. (Doc. 38–16 at 20). Adding that to the $2,611 for the other 8.88 acres yielded total a post-taking value for the entire tract of $2,932,174. (*Id.*) And subtracting that sum from his pre-taking value estimate of $3,055,950, Pettey concluded that Defendants are entitled to $123,776 in just compensation for the Moores Mill tract. (Doc. 38–14 at 5, Doc. 38–17 at 22).

## III.

As stated previously, the Government has filed substantially identical motions in limine in each case seeking to exclude certain portions of Maddox's testimony and to preclude Enfinger and Warren from giving any opinions on market value.

In support, the Government contends that any opinion testimony from Enfinger and Warren as non-retained experts is inadmissible because Defendants' disclosures do not, the Government claims, sufficiently set forth "a summary of the facts and opinions to which [they] are expected to testify," as required by FED. R. CIV. P. 26(a)(2)(C)(ii). The Government also contends that the testimony of Defendants' experts, both retained and non-retained, is subject to exclusion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), on the theory that such opinions are based upon a flawed methodology that assigns separate values to (a) 28 hypothetical residential lots fronting on Moores Mill Road, (b) a 5.22–acre "commercial corner" development at the intersection of Moores Mill Road and Steger Road, and (c) a buffer between the power lines and the first line of would-be residential development to the east. The Government also contends that damages claimed by Defendants for delays in developing the properties, including interest payments on Defendants' loans, are not compensable under the Fifth Amendment and that any testimony as to such losses is inadmissible. Finally, the Government contends that the Development Agreement between MMC and the sellers of that tract is not a compensable property interest under the Fifth Amendment and is legally irrelevant to the just compensation determination.

Defendants have dispute all of the Government's arguments. (*See* Doc. 41, Doc. 44). Defendants take the position that Maddox, Enfinger, and Warren are all qualified; that their proposed opinions are adequately disclosed, reliable, and admissible in their entirety; and that any purport-

---

4. The term "uneconomic remnant" generally means property that remains after a taking that is of such shape or size as to be of no practical value to its owner. *See* 2A *Nichols on Eminent Domain* § 7.25(1); 49 C.F.R. § 24.2(27).

ed deficiencies cited by the Government are merely issues for the jury to consider in assigning weight to their testimony. Defendants also insist that they are entitled to recover for interest payments they made during the period they were unable to develop the property while they waited for TVA to decide where it would locate its power line easement. Finally, Defendants maintain that evidence regarding the Development Agreement is relevant and admissible. The court now proceeds to consider the parties' respective arguments on these issues in greater detail.

### A. FEDERAL RULE OF EVIDENCE 702 and *Daubert*

Defendants make several attacks on the admissibility of the testimony of Maddox, Enfinger, and Warren based on FED. R. EVID. 702 and *Daubert*. Rule 702 controls the admission of expert testimony in the federal courts. It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, the Supreme Court held that FED. R. EVID. 702 imposes a "gatekeeping" obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." 509 U.S. at 589 & n. 7, 113 S.Ct. 2786. The Court later clarified that this function applies to all expert testimony under Rule 702, not just "scientific" testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (en banc) (quoting *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167).

In determining the admissibility of expert testimony, the court is to "engage in a rigorous three-part inquiry," considering

whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier,* 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562 (11th Cir.1998)). While there is "some overlap" among these requirements, "they remain distinct concepts and the courts must take care not to conflate them." *Id.* The proponent of expert testimony bears the burden at trial to establish these elements of admissibility. *Id.* However, a party moving in limine under *Daubert* to preclude testimony by his opponent's expert must first make a threshold showing sufficient to indicate that his adversary will be unable to meet

his burden at trial with regard to the testimony. *See Gottstein v. Flying J, Inc.,* 2001 WL 36102297, at *1 (N.D.Ala. Aug. 22, 2001); *see also Andrew I. Gavil, Defining Reliable Forensic Economics in the Post–Daubert/kumho Tire Era: Case Studies from Antitrust,* 57 Wash. & Lee L.Rev. 831, 849 & n.76 (2000); *cf. Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991) (recognizing that, even where a party has the burden of proof at trial, that party need not produce proof supporting his claim in response to a motion for summary judgment unless the movant has first presented evidence that would negate an element of the non-movant's claim or indicates that the non-movant will be unable to meet his burden at trial; "it is never enough simply to state that the non-moving party cannot meet its burden at trial").

■■■■ As to the first element, the Eleventh Circuit has recognized that "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier,* 387 F.3d at 1261. "Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Id.* Rather, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability.... [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." *Id.* (quoting *Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341–42 (11th Cir.2003)). Further,

■■■ "[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' " If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

*Id.* (quoting FED. R. EVID. 702 Advisory Committee Notes (2000 amends.) (emphasis in *Frazier*).

■■■■ Turning to the second requirement, the trial judge must evaluate the reliability of expert opinion by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 1262 (quoting *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786). In this inquiry, courts generally consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Frazier,* 387 F.3d at 1262. However, "these factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.* "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* (citing *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167; *Clark v. Takata Corp.,* 192 F.3d 750, 758 (7th Cir. 1999)). "Exactly how reliability is evaluat-

ed may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." *Id.*

▆ And finally, on the third requirement, the Eleventh Circuit has stated, that expert testimony must "assist the trier of fact" by shedding light on matters "that are beyond the understanding of the average lay person." *Id.* (citing *United States v. Rouco,* 765 F.2d 983, 985 (11th Cir. 1985)). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *Frazier,* 387 F.3d at 1262–63.

▆ While undertaking these analyses, however, it must be recalled that "[a] district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.' " *Quiet Technology,* 326 F.3d at 1341 (quoting *Maiz v. Virani,* 253 F.3d 641, 666 (11th Cir.2001), quoting *Allison v. McGhan,* 184 F.3d 1300, 1311 (11th Cir.1999)); *see also Adams v. Laboratory Corp. of Amer.,* 760 F.3d 1322, 1334 (11th Cir.2014); *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.,* 80 F.3d 1074, 1078 (5th Cir.1996). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786; *see also United States v. 0.161 Acres of Land, more or less, situated in City of Birmingham, Jefferson Cnty., Ala.,* 837 F.2d 1036, 1042 (11th Cir.1988). Accordingly, while the court must determine that expert testimony is sufficiently reliable to be admissible, once it has done so, "it is not the role of the district court to make ultimate conclusions as to the per-

suasiveness of the proffered evidence." *Quiet Technology,* 326 F.3d at 1341; *see also 0.161 Acres of Land,* 837 F.2d at 1040–41 ("Importantly, the jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion.").

## B. Applicability of Gatekeeping and Screening Requirements to the Testimony of Enfinger and Warren as Landowners

The Government's primary argument is that the court should exclude opinions by Maddox, Enfinger, and Warren to the extent that they assign separate values for (1) the lost opportunity to develop 28 residential lots running along the easement, (2) the lost opportunity to develop a 5.22–acre "commercial corner" and (3) lost value of land needed as a "buffer" between the power lines and the nearest residential development on the remaining property. (Doc. 38 at 14). The Government contends that such opinions are all based on prospective residential and commercial development that is unsupported by market data and is otherwise overly speculative. In effect, the Government takes the position that the only valid valuation method is to determine the difference in price that a willing buyer would pay a willing seller for the *entirety* of each of the two tracts. Alternatively, the Government contends that, even if it might be appropriate to assume that the tracts might be divided and sold as residential lots and/or with the "commercial corner," the opinions of Defendants' witnesses as to the lost value of such lots and for a "buffer" are still due to excluded as overly speculative because they are not based on comparable sales or other market data and are otherwise flawed in their methodology.

At the outset, Defendants respond that all of the Government's arguments raising purported deficiencies in methodology and foundation as it relates to testimony by Enfinger and Warren are due to be rejected because those witnesses, as Defendants' principals and designated Rule 30(b) corporate representatives, are effectively owners of the subject properties. That status, Defendants say, entitles Enfinger and Warren to give opinions on the value of the land "without further qualification due to the special knowledge that arises from ownership." (Doc. 41 at 15). Indeed, Defendants take the position that, Enfinger and Warren have an "inherent ability" to testify as owners of the land (*id.* at 23) such that any opinions they might offer on its value are essentially immune from attack on their admissibility based upon any purported deficiency in methodology or foundation. (*See id.* at 17, 19).

The Government concedes in its reply that it is not now contesting that Enfinger and Warren might testify as landowners as to the value of the properties. (*See* Doc. 44 at 10 n. 5). The Government insists, however, that Defendants are improperly using Enfinger and Warren's status as landowners to circumvent the requirements of Rule 702 and *Daubert*. "Despite Defendants protestations to the contrary," says the Government, "the gate-keeping function of Rule 702 applies to *all* expert testimony, *including* landowner testimony." (Doc. 44 at 4) (emphasis original).

 A long line of precedent establishes a general rule in this circuit that "an owner of property is competent to testify regarding its value." *Neff v. Kehoe*, 708 F.2d 639, 644 (11th Cir.1983); *see also Hessen for Use & Benefit of Allstate Ins. Co. v. Jaguar Cars, Inc.*, 915 F.2d 641, 646 (11th Cir.1990); *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1469 (11th Cir.1989); *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1526 (11th Cir.1988); *T.D.S., Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1533 (11th Cir.1985); *J & H Auto Trim Co. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1369 (11th Cir.1982); *Dietz v. Consolidated Oil & Gas, Inc.*, 643 F.2d 1088, 1094 (5th Cir.1981); *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Tex.*, 614 F.2d 1056, 1061 (5th Cir.1980); *Meredith v. Hardy*, 554 F.2d 764, 765 (5th Cir.1977); *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 698–99 (5th Cir. 1975); *Berkshire Mut. Ins. Co. v. Moffett*, 378 F.2d 1007, 1011 (5th Cir.1967). The owner is generally presumed to be qualified to give such an opinion based on "his ownership alone." *Moffett*, 378 F.2d at 1011; *see also United States v. 68.94 Acres of Land, More or Less, Situate in Kent Cnty., State of Del.*, 918 F.2d 389, 397 (3d Cir.1990) ("[T]he owner is deemed to have sufficient knowledge of the price paid, the rents or other income received, and the possibilities of the land for use, to render an opinion as to the value of the land." (quoting *Nichols on Eminent Domain* § 23.03 at 23–30 (1990) (citations omitted)); *United States v. 329.73 Acres of Land, Situated in Grenada & Yalobusha Counties, State of Miss.*, 666 F.2d 281, 284 (5th Cir.1982) ("[O]pinion testimony of a landowner as to the value of his land is admissible without further qualification. Such testimony is admitted because of the presumption of special knowledge that arises out of ownership of the land." (citations omitted)); *LaCombe v. A–T–O, Inc.*, 679 F.2d 431, 434 (5th Cir.1982); *Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532, 542 (4th Cir.2007); *United States v. 10,031.98 Acres of Land, More or Less, Situate in Las Animas Cnty., Colo.*, 850 F.2d 634, 636 (10th Cir.1988); *District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land*, 534 F.2d 337, 339 (D.C.Cir.1976). In fact, the Eleventh Circuit has gone so far as to suggest that a

witness's opinion of value of his personal property is generally admissible even· if "self-serving and unsupported by other evidence." *Neff*, 708 F.2d at 644 (quoting *J & H Auto Trim Co.*, 677 F.2d at 1369). Similarly, our court of appeals has rejected arguments contesting the admissibility of an owner's testimony on the value of his property on the ground that it lacks a sound basis, concluding that such matters go only to the weight of the testimony and thus are to be challenged through cross-examination and refuting evidence. *See Gregg*, 887 F.2d at 1469; *Electro Services, Inc.*, 847 F.2d at 1526–27; *Neff*, 708 F.2d at 644; *J & H Auto Trim Co.*, 677 F.2d at 1369; *Meredith*, 554 F.2d at 765; *see also 329.73 Acres of Land, Situated in Grenada & Yalobusha Counties, State of Miss.*, 666 F.2d at 284 ("[A]ppellant attacks the probative value of [the landowner's] testimony on the grounds that it was not based on any accepted method of valuation, but this overlooks the fact that the opinion testimony of a landowner as to the value of his land is admissible without further qualification.").

It is fair to say that Defendants are claiming that the opinions of Enfinger and Warren on the value of the land are exempt from the strictures of Rule 702 and *Daubert* because they are owners of the property. There is no doubt that Rule 702, from which *Daubert*'s gatekeeping function springs, may apply to testimony on property valuation. *See* FED. R. EVID. 702, Advisory Committee Note to 1972 Proposed Rule ("[W]ithin the scope of [Rule 702] are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or *landowners testifying to land values*" (emphasis added); *id.* Advisory Committee Note to 2000 Amendments ("Whether the [expert] testimony concerns economic principles, accounting standards, *property valuation* or other non-scientific subjects, it should be evaluated by reference to 'the 'knowledge and experience' of that particular field" (quoting *American College of Trial Lawyers, Standards and Procedures for Determining the Admissibility of Expert Testimony after* Daubert, 157 F.R.D. 571, 579 (1994) (emphasis added)).

▮▮ Nonetheless, contrary to the Government's assertion, Rule 702 does not always apply to opinion testimony by a witness as it relates to the value of his own land or property. Although not cited by Defendants, Rule 701 of the FEDERAL RULES OF EVIDENCE permits a *lay* witness, *i.e.*, a witness who is "not testifying as an expert," also to give opinion testimony, subject to the conditions that the opinion is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

▮▮ FED. R. EVID. 701. Rule 701 thus authorizes "a lay witness to testify in the form of opinions or inferences drawn from her observations when testimony in that form will be helpful to the trier of fact." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988); *see also Daubert*, 509 U.S. at 592, 113 S.Ct. 2786 ("Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703.").

Further, it is established that testimony by a witness relating the value of his own

land or property may be admissible as a lay opinion. *See Neff,* 708 F.2d at 643–44 (holding that even though the plaintiff was "not tendered as an expert," he should have been permitted to give his "lay opinion" as to the value of his coin collection, which was "based upon coin collector publications, upon appraisals he received from various collectors and upon his own experience as owner of the collection"); *Arkansas Natural Gas Co. v. Sartor,* 78 F.2d 924, 927 (5th Cir.1935) ("It is also well settled that value may be shown by the opinion of any competent person having knowledge of the facts, whether an expert or an ordinary witness."); *United States v. Durrett,* 524 Fed.Appx. 492, 497 (11th Cir. 2013); *Galloway,* 492 F.3d at 542; *United States v. Wiseman,* 339 Fed.Appx. 196, 199 (3d Cir.2009); *James River Ins. Co. v. Rapid Funding, LLC,* 658 F.3d 1207, 1215 & n. 1 (10th Cir.2011); *Cunningham v. Masterwear Corp.,* 569 F.3d 673, 676 (7th Cir.2009); *Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190, 1197–98 & n. 8 (3d Cir.1995) (citing "value of one's property" among examples of "quintessential Rule 701 opinion testimony"); *Greenwood Ranches, Inc. v. Skie Const. Co.,* 629 F.2d 518, 522 (8th Cir.1980); *District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337, 339 (D.C.Cir.1976); *see also* J.E. Macy, *Competency of Witness to Give Expert or Opinion Testimony as to Value of Real Property,* 159 A.L.R. 7 (1946) ("Broadly speaking, the rules which govern opinion evidence as to value in the case of real property are those which govern such evidence in the case of property in general. And the view which still widely prevails is that in either case the witness need not be an expert."); Model Eminent Domain Code § 1103 (2002 Supplement) (distinguishing between an owner of real property and an expert "witness qualified by knowledge, skill, experience, training, or education" and recognizing that either may testify to opinions on value). This approach is also supported by the Advisory Committee Note to the 2000 Amendment to Rule 701, which states in relevant part:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g., Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir.1993). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.

*See also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.,* 320 F.3d 1213, 1217–23 (11th Cir.2003),

However, Rule 701 "does not distinguish between expert and lay *witnesses,* but rather between expert and lay *testimony.*" FED. R. EVID. 701, Advisory Committee Note to the 2000 Amendment (emphasis original). Thus, within the testimony of a single witness, one opinion may fall under Rule 701 and another under Rule 702. *Id.; see also Lebron v. Secretary of Fla. Dep't of Children & Families,* 772 F.3d 1352, 1372 (11th Cir.2014) (recognizing that while a "lay witnesses may testify about their own immediate perceptions [under Rule 701], testimony that blurs into supposition and extrapolation crosses the line into expertise"); *Wilson v. Taser Int'l, Inc.,* 303 Fed.Appx. 708, 712 (11th Cir.2008). And distinguishing between lay and expert opinion testimony in this respect is critical. In contrast to expert opinion testimony, lay opinion testimony admissible under Rule 701 is not subject to the gatekeeping requirements of

*Daubert, see Williams v. Mast Biosurgery USA, Inc.,* 644 F.3d 1312, 1317–18 (11th Cir.2011), or to expert disclosure requirements under rules of court. *See Tampa Bay Shipbuilding & Repair Co.,* 320 F.3d at 1217–23; *United States v. Tinoco,* 304 F.3d 1088, 1119 (11th Cir.2002). This is so because "[l]ay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *United States v. Conn,* 297 F.3d 548, 554 (7th Cir.2002) (quoting *United States v. Peoples,* 250 F.3d 630, 641 (8th Cir.2001)); *see also* FED. R. EVID. 701, Advisory Committee Note to 2000 Amendments (recognizing that Rule 701 as amended incorporates the distinction set forth in *State v. Brown,* 836 S.W.2d 530, 549 (Tenn.1992), in which the court stated that lay testimony "results from a process of reasoning familiar in everyday life" whereas expert testimony "results from a process of reasoning which can be mastered only by specialists in the field"). However, courts must be vigilant to ensure that the gatekeeping requirements of Rule 702 are not " 'evaded through the simple expedient of proffering an expert in lay witness clothing.' " *Williams,* 644 F.3d at 1317 (quoting *United States v. Henderson,* 409 F.3d 1293 (11th Cir.2005) (quoting FED. R. EVID. 701 Advisory Committee Note to the 2000 Amendment)).

Accordingly, that Rule 701 may authorize a witness to give a lay opinion on the value of his property does not mean that a landowner has *carte blanche* to espouse any opinion he pleases on the value of his land, free from the constraints of Rule 702 and *Daubert.* If an owner's testimony on value is based not upon commonly understood considerations of worth flowing from his perceptions and knowledge of his property but instead upon technical or specialized knowledge more broadly, it crosses into expert testimony for purposes of Rule 702 and cannot be admitted under Rule 701(c). *See James River Ins. Co.,* 658 F.3d at 1213–16 (holding that district court abused its discretion in allowing member of LLC that owned building to testify to its value under Rule 701 where his opinion had relied upon technical depreciation calculations, the principal's professional experience as a real estate broker, and a detailed technical report created by a retained appraisal company); *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.,* 533 F.3d 555, 561 (7th Cir.2008) ("Taylor's valuation attempt was based on his special experience in the tire industry, not on his personal knowledge of the goods in question; therefore, it falls within the purview of Rule 702"); *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 929–30 (10th Cir.2004) (CEO's testimony about his business's lost profits were expert, not lay, opinion because his results were based on sophisticated economic models concerning "moving averages, compounded growth rates, and S-curves"); *United States v. 242.93 Acres of Land More or Less,* 2012 WL 579503, at *3 n. 2 (S.D.Cal. Feb. 22, 2012) (recognizing that the Advisory Committee Notes suggest that "a landowner's opinion as to the value of the property could be offered under either FRE 701 or FRE 702, presumably depending on the level of 'experience, training or specialized knowledge' that went into formulating the opinion" (quoting FED. R. EVID. 702)); 5 *Handbook of Fed. Evid.* § 701:1 (7th ed.) (hypothesizing that "if Bill Gates were to testify that divestiture of a segment of Microsoft's business would result in a loss of one billion dollars over five years," he would be

testifying as an expert under Rule 702 because "projecting such loss is not based upon the types of experiences common to human beings"); *Bankr.Evid. Manual* § 701:2 (2014 ed.) ("If testifying under 701, the owner may merely give his opinion based on his personal familiarity of the property, often based to a great extent on what he paid for the property. On the other hand, if he is truly an expert qualified under the terms of Rule 702 'by knowledge, skill, experience, training or education ...', then he may also rely on and testify as to facts "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject ..." pursuant to Rule 703.").

■■■ Further, "the owner's qualification to testify does not change the 'market value' concept and permit him to substitute a 'value to me' standard for the accepted rule [in condemnation cases], or to establish a value based entirely upon speculation." *United States v. Sowards,* 370 F.2d 87, 92 (10th Cir.1966). "Qualified and knowledgeable witnesses may give their opinion or estimate of the value of the property taken, but to have probative value, that opinion or estimate must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation." *Id.*; *see also Snowbank Enterprises, Inc. v. United States,* 6 Cl.Ct. 476, 486 (1984). Thus, if a landowner's testimony reveals that his opinion of value rests upon a legally invalid foundation, such as the price upon which he personally would insist to sell the land, his opinion would lack any probative value. *Smith,* 355 F.2d at 810; *see also United States v. Trout,* 386 F.2d 216, 223 n. 10 (5th Cir.1967); *King v. Ames,* 179 F.3d 370, 376 (5th Cir.1999) (recognizing that an owner's opinion testimony on the value of his property "cannot be based on naked conjecture or solely speculative factors"); *Dietz,* 643 F.2d at 1094 ("[W]here the owner bases his estimation [of the value of his property] solely on speculative factors, the owner's testimony may be of such minimal probative force to warrant a judge's refusal even to submit the issue to the jury." (quoting *Kestenbaum,* 514 F.2d at 699)); *United States v. Nall,* 437 F.2d 1177, 1187 (5th Cir.1971); *United States v. 158.24 Acres of Land, More or Less, Situate in Ashley, Bradley & Union Counties, State of Ark.,* 696 F.2d 559, 564–65 (8th Cir.1982) ("a trial court has an independent obligation, to a reasonable extent, to see that the landowner's claim is submitted only on competent evidence"); *also cf. Smith,* 355 F.2d at 813–14 (valuation testimony of a local landowner who claimed generally to have sufficient knowledge to give an opinion was of no probative value where it appeared to be based merely upon "undisclosed assumptions"). It goes without saying that an opinion that lacks material probative value may be subject to exclusion, either because it is not relevant, *see* FED. R. EVID. 401, 402; because any marginal probative value it might possess is substantially outweighed by a danger of unfair prejudice or a tendency to mislead the jury, *see* FED. R. EVID. 403; or because the opinion does not assist the trier of fact, *see* FED. R. EVID. 701(b), 702(a). *See generally 0.161 Acres of Land,* 837 F.2d at 1040–42 (discussing the relationship between relevancy, Rule 403, and expert testimony on land valuation).

■■■ Finally, the court's obligation in condemnation cases to screen evidence of proposed highest and best uses under *320.0 Acres of Land* also may at times dovetail with the court's gatekeeping responsibilities under *Daubert* and may call for exclusion of a witness's opinion on the value of his own land because of its under-

lying basis. That is, if a landowner's value opinion is shown to be founded upon the land's suitability for a particular proposed use, the opinion may be subject to exclusion if the landowner has not made a preliminary showing that such proposed "use [is] practicable and that there [is] reasonable likelihood that the land would be so used in the reasonably near future," *320.0 Acres of Land*, 605 F.2d at 814. *See United States v. 99.66 Acres of Land*, 970 F.2d 651, 656 (9th Cir.1992) (holding that landowner's testimony based on "lot method" was properly excluded in condemnation case involving property that owner proposed to develop as mobile home park where subdivision development was speculative); *Olson*, 292 U.S. at 257, 54 S.Ct. 704 ("Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for ascertainment of value."); *158.24 Acres of Land*, 696 F.2d at 562 ("The uses considered must be so reasonably probable as to have an effect upon the present market value of the land, and a speculative value cannot be considered."). With the above general framework in mind, the court now turns to consider the Government's arguments in support of exclusion of opinions of Maddox, Enfinger, and Warren.

## C. Disclosures under FED. R. CIV. P. 26(a)(2)(C)

The Government first makes a procedural argument aimed at excluding any opinion testimony by Enfinger or Warren, based on FED. R. CIV. P. 26(a)(2)(C). Under that provision, a party must supply a disclosure as it relates to non-retained expert witnesses, stating "the subject matter on which the witness is expected to pres-

ent evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C). Defendants have provided disclosures that outline opinions that Enfinger and Warren might be expected to give as it relates to highest and best use of the land, lost value, and other claimed damage. (*See* Doc. 38–4; Doc. 41–6). The Government argues generally that Defendants' disclosures do not contain the information required by Rule 26(a)(2)(C), precluding Enfinger and Warren from giving any opinion testimony.

However, insofar as Enfinger or Warren's testimony relative to value might qualify as lay opinion under FED. R. EVID. 701, Defendants need not provide a Rule 26(a)(2) expert disclosure at all. *See Fisher v. Ciba Specialty Chemicals Corp.*, 2007 WL 2995525, at *7–8 (S.D.Ala. Oct. 11, 2007); *see also Tampa Bay Shipbuilding & Repair Co.*, 320 F.3d at 1217–23. But even if their testimony encompasses expert opinions, disclosure under Rule 26(a)(2)(C) for non-retained experts "is considerably less extensive than the report required by Rule 26(a)(2)(B)" for retained experts, and "[c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have." Advisory Committee Note to the 2010 Amendments to Rule 26, FED. R. CIV. P. In that light, the court concludes that Defendants' disclosures were adequate to put the Government on notice of the facts and opinions upon which Enfinger and Warren are expected to testify. The court would further note that the Government also took extensive depositions of both witnesses, during which counsel explored both the substance and the basis for their opinions. (*See generally* Doc. 38–9, Doc. 38–

12). The Government's motions in limine are therefore denied to the extent based on FED. R. CIV. P. 26(a)(2)(C).

### D. Opinions Ascribing Separate Losses for Discrete Areas of the Land

The Government broadly challenges the valuation methodology used by Enfinger, Warren, and Maddox, characterizing it as "inherently flawed" because it assigns and aggregates distinct loss values for the 28 "residential lots, the commercial corner, and a buffer area as separate parcels." (Doc. 38 at 13). The Government contends that this "is not a proper application of methodology" because, the Government maintains, compensation in a partial takings' case like this one must be based on the difference in value of the *entire parcel as a whole*, before and after the taking. (*Id.* at 13–14). Defendants do not dispute that their valuation witnesses have assigned separate loss values for particular parcels within the tract. Defendants respond, however, that the Government's insistence upon a "before-and-after" approach that examines the entire parcel only as a whole is overly rigid and not mandated by law.

"Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after' method, *i.e.*, 'the difference between the value of the property before and after the Government's easement was imposed.'" *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1364 (Fed.Cir.2012) (quoting *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 632, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961)); *see also 2,997.06 Acres of Land*, 471 F.2d at 334 n. 16; *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 21 (5th Cir.1969); *United States v. 33.92356 Acres Of Land*, 585 F.3d 1, 9 (1st Cir.2009); *8.41 Acres of*

*Land*, 680 F.2d at 392. "Under the before and after theory, the tract is considered as a whole; that is, compensation is fixed by determining the difference between the value of the owner's entire tract, including the parcel taken, before the taking by the condemning authority, and the value of his remaining property." *2,997.06 Acres of Land*, 471 F.2d at 334 n. 16; *see also Transwestern Pipeline*, 418 F.2d at 21; *Slattery Co. v. United States*, 231 F.2d 37, 45–47 (5th Cir.1956); *United States v. Certain Parcels of Land in Rapides Parish, La.*, 149 F.2d 81, 82 (5th Cir.1945). However, it may be more practical in a partial takings case to examine the lost value of the land actually taken and then determine whether the landowner is entitled to an additional amount of "severance damages" for any amount by which the taking has diminished the value of the remainder. *See 4A Nichols on Eminent Domain*, § 14.31; *United States v. Merz*, 376 U.S. 192, 198, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964); *O'Brien v. United States*, 392 F.2d 949, 953–54 (5th Cir.1968); *United States v. 97.19 Acres of Land, More or Less*, 582 F.2d 878, 881 (4th Cir.1978); *see also* 42 U.S.C. § 4651(3) (providing that a federal agency seeking to condemn land shall estimate the amount due as just compensation and make an offer of such amount to the owner, accompanied by a written statement summarizing the agency's basis for the amount offered and noting that "[w]here appropriate the just compensation for the real property acquired and for damages to remaining real property shall be separately stated."). Indeed, the "before-and-after" approach and the "value-plus-severance" approach are in substance just different ways of expressing the same idea: that the landowner in a partial takings case is entitled to just compensation for the lost value to all of his land, not just the parcel actually taken. *See Slattery Co.*, 231 F.2d at 44 ("While [the landown-

er's expert appraisers] came at [their opinions on just compensation] by dividing the 1200 acres up into tracts for purposes of valuation and by putting a valuation with and without the servitude on each tract, the effect of their testimony was to value the tract as a whole without and with the servitude."); *United States v. 403.14 Acres of Land, More or Less, in St. Clair Cnty., State of Mo.,* 553 F.2d 565, 567 n. 2 (8th Cir.1977) ("Where in the case of a partial taking just compensation is measured by the difference between the 'before' and 'after' values shown by the evidence, there is no occasion for the making of any special award or determination of 'severance damage,' because the matter is included in the finding of what the remainder of the land was worth immediately after the taking."); *United States ex rel. and for Use of TVA v. Easement & Right-of-Way over 1.0 Acre of Land, More or Less, in Madison Cnty., Tenn.,* 248 F.Supp. 702, 703 (W.D.Tenn.1965) ("The award should be an amount equal to the difference between the reasonable market value of the entire tract immediately before and immediately after the taking, or, what amounts to the same thing, an amount equal to the decrease in the reasonable market value of the fee in the land covered by the easement plus the incidental damage to the tract outside the easement area.").

It is true that Maddox, Enfinger, and Warren have assigned and aggregated individual loss values based on the premise that the takings prevent or hinder Defendants from developing or selling particular portions of the land that are on or adjacent to the TVA's easements. The Government laments that this approach "leads to inflated values for the 'damaged' portion of the land and deflated values for the portion of the land unaffected by the taking." (Doc. 44 at 8). However, provided that the aggregation of lost value for separate areas accurately reflects the diminution in value

to all of the condemnee's tract, it is unclear how such an approach is inherently unreliable or unfair. The Government cites no authority for its suggestion that a partial taking is assumed to affect the entirety of a condemnee's tract on a uniform basis. To the contrary, such a notion seems artificial, particularly where, as here, the land taken is relatively small in area and fronts on a roadway while the remainder is sufficiently large that portions might have different characteristics relative to value and the taking might be expected to have less impact on more distant areas. *Cf. United States v. 478.34 Acres of Land, Tract No. 400,* 578 F.2d 156, 159 (6th Cir.1978) (holding that although the lower court had "properly excluded evidence that the whole farm or a substantial portion of it could be subdivided in the near future," there was sufficient evidence that the property was "adaptable and needed or likely to be needed in the reasonably near future for home site development along the road" (internal quotation marks and citation omitted)). Indeed, the drafters of the Model Eminent Domain Code have recognized:

> [A]ll parts of an entire tract of property do not necessarily have equal value. The fair market value of property which, before the taking, was part of a larger parcel should thus be determined by considering both the value of the entire tract and the relationship of the part taken to the whole. Under some circumstances, the severed part may have a value for its highest and best use which is independent from that of the entire parcel. In other situations, the part taken may be so related to and may so contribute to the value of the entire property that its value for its highest and best use is dependent upon the value of the entire tract.... [P]arties [should be] free to present competent

evidence in support of their respective theories of independent or dependent value from a market perspective, so that the property owner may be compensation [sic] for the part taken at not less than the fair market value shown by the approach which the trier of fact deems most persuasive.

Model Eminent Domain Code § 1105, Comment to 2002 Main Volume.

 And for all of the Government's arguments that Defendants' witnesses are calculating lost value for separate parts of the land and adding them together, the Government's expert has functionally done the same thing. That is, Pettey would determine just compensation for the Moores Mill tract by assigning (1) a diminution in value to the entire tract based on an estimated $60,500 cost to construct two short access roads across the easement[5]; (2) an additional 96% diminution specific to the 6.09 acres of the easement itself, and (3) the same 96% diminution to an additional 2.79 acres on the remainder bordering the easement, which he deemed an "uneconomic remnant," and then aggregating those losses. At least the second and

third of those items are plainly separate loss values for the taken land and for the remainder,[6] even Pettey subsequently made a calculation that spreads those losses over the entire tract on a per-acre basis. *Cf.* Note 6, *ante.* Accordingly, the court declines to exclude the opinions of Defendants' valuation witnesses on the specific ground that they aggregate separate losses stemming from restrictions from the taking that allegedly prevent or hinder Defendants from being able to sell or develop particular areas or parcels within each tract.

### D. "Lot Method" Opinions Based on Assumed Residential Subdivision

 The Government contends that the opinions of Maddox, Enfinger, and Warren are inadmissible to the extent that they use the "lot method," by which an undivided tract of land is valued based upon how it might be subdivided and sold in the future as smaller parcels, or "lots."[7] With the lot method, one first determines or projects both how the land would be subdivided and the prices at which those lots would sell. The projected gross sale

5. Pettey adjusted for the cost to build these two access points by reducing the per-acre value of the entire Moores Mill tract by 2%, from from $7,500 to $7,350. (Doc. 38–16 at 12, 19–20). However, such calculation seems simply to have been a means by which to spread the $60,500 cost over the 400–or–so acres of the tract. That is, it appears that, for Pettey, what mattered was the amount of the cost item and that his subsequent per-acre adjustment was driven simply by the size of the tract. Accordingly, for example, if the Moores Mill tract were about 200 acres in size instead of about 400, Pettey still would have factored in the same cost and would have thus deemed each acre to have been worth $300 less rather than $150 less.

6. Pettey's analysis of whether power lines on the easement might diminish the remainder also recognized that any such damage would be incurred disproportionately on the land

nearest the easement. While Pettey ultimately rejected that power lines devalue the remainder, his analysis clearly presumed that if any damage would be felt, it would be principally, if not exclusively, on land that might be used for future residential lots that would back up to the eastern border of easement. (*See* Doc. 38–16 at 22–29, Doc. 38–17 at 1–21).

7. The lot method is also known by a host of other names, including the "subdivision approach," the "development approach," the "cost of the development method," the "developer's residual approach," the "anticipated use method", and the "developer's absorption method." *See 99.66 Acres of Land,* 970 F.2d at 654; *147.47 Acres of Land,* 352 F.Supp. at 1060; *Lehigh–Northampton Airport Auth. v. Fuller,* 862 A.2d 159, 166 n. 3 (Pa. Commw.Ct.2004).

proceeds for all lots in the tract are then aggregated and a deduction is made for all projected direct and indirect costs of maintenance and sale, including development and marketing. Finally, the net amount is discounted to present value to reflect that the lots would be sold over time, *i.e.,* an absorption period, considering projected market demand. *See 99.66 Acres of Land,* 970 F.2d at 655; *In re Vallambrosa Holdings, LLC,* 411 B.R. 899, 909 (Bankr. S.D.Ga.2009). Defendants' witnesses would to use that method here to value an area of the Moores Mill and Fanning tracts running along the easements, which Defendants say could have been subdivided into 28 individual unimproved lots, about 80 feet wide by about 200 feet deep, each suited for construction of a single-family home. Defendants claim that the takings preclude that course such that the tracts have lost value reflected by the combined sum that those 28 hypothetical residential lots would have commanded if sold individually, minus costs, and discounted assuming an absorption period of 2.25 years. Maddox calculates that lost value at $426,000, while Enfinger and Warren claim it was $615,630. The difference between those figures derives *principally* from the fact that Maddox assumes each lot would sell for $20,000 (Doc. 38–2 at 34–39) while the landowners assume a sale price of $32,500. (Doc. 38–11 at 6, 13, 15). The Government contends, however, that all of these opinions are inadmissible because the assumptions underlying the subdivision and sale projections are overly speculative and because sufficient comparable sales exist and are a more reliable indicator of market value.

▮ At the outset, to the extent that Defendants assert that Enfinger and Warren are entitled in their capacity as landowners to give opinions based on the lot method without regard to Rule 702 or *Daubert,* the court disagrees. Enfinger and Warren's opinions calculating a loss for the 28 residential lots are materially indistinguishable, methodologically speaking, from those of Defendants' retained expert appraiser, Maddox. That is, they all rely upon relatively sophisticated discounted cash flow formulas that incorporate assumptions about lot size and price, the rate of future sales given projected market demand, the type and amount of costs associated with maintaining and selling the lots, and discounting the net amount to present value. (*Compare* Doc. 38–2 at 34–39 *with* Doc. 38–11 at 13, 15). These are not matters familiar to laymen when it comes to valuing an undeveloped piece of land. To the contrary, just as Maddox relies upon his expertise as an appraiser in making these calculations, Enfinger and Warren lean upon specialized knowledge obtained through their education and experience as real estate developers. In fact, Defendants urge that Enfinger and Warren are "independently qualified" as experts based on just that "vast experience" as developers to give the identical opinions they would give as landowners. (Doc. 44 at 15; *see also id.* at 18–19). The court thus concludes that Enfinger and Warren's testimony based on their lot method calculations are, like Maddox's, expert opinions under Rule 702. Therefore, these opinions cannot be admitted under Rule 701 and are subject to *Daubert. See James River Ins. Co.,* 658 F.3d at 1213–16; *Titan Int'l, Inc.,* 533 F.3d at 561; *LifeWise Master Funding,* 374 F.3d at 929–30. With that, the court turns to consider the Government's arguments as it relates to the opinions of Maddox, Enfinger, and Warren based on the lost opportunity to divide and sell the 28 hypothetical residential lots.

▮ ▪ As the Government emphasizes, "[c]ourts have consistently recog-

nized that, in general, comparable sales constitute the best evidence of market value." *320.0 Acres of Land*, 605 F.2d at 798 (footnote omitted). Comparable sales are defined as " 'sales from a willing seller to a willing buyer of similar property in the vicinity at or about the same time as the taking.' " *0.161 Acres of Land*, 837 F.2d at 1040 (quoting *320.0 Acres of Land*, 605 F.2d at 798). Comparability is largely a function of three variables: characteristics of the properties, their geographic proximity to one another, and the time differential. *Id.* at 1043 (quoting *320.0 Acres of Land*, 605 F.2d at 798). "If exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the 'market price' becomes so important a standard of reference." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

"Perhaps no warning," however, "has been more repeated than that the determination of value cannot be reduced to inexorable rules." *United States v. Toronto, Hamilton & Buffalo Nav. Co.*, 338 U.S. 396, 402, 70 S.Ct. 217, 94 L.Ed. 195 (1949). "The only absolute standard is that provided by the Constitution 'just compensation' and the only sure guide in a difficult condemnation case is the consideration 'What compensation is "just" both to (the) owner whose property is taken and to the public that must pay the bill?" *320.0 Acres of Land*, 605 F.2d at 781 (quoting *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707 (1950)). "In some cases, strict adherence to market value and comparable sales will result in manifest injustice to the owner or to the public, and courts must apply special rules and standards to arrive at 'just' compensation." *480.00 Acres of*

*Land*, 557 F.3d at 1307. Further, courts have recognized that

> [a]rtificial rules of evidence which exclude from the consideration of the jurors matters which men consider in their everyday affairs hinder rather than help them at arriving at a just result. In no branch of the law is it more important to remember this, than in cases involving the valuation of property, where 'at best, evidence of value is largely a matter of opinion'.

*68.94 Acres of Land*, 918 F.2d at 393–94 (quoting *United States v. 60.14 Acres of Land, Etc.*, 362 F.2d 660, 668 (3rd Cir. 1966) (quoting, in turn, *United States v. 25.406 Acres of Land*, 172 F.2d 990, 995 (4th Cir.1949) (citations omitted)). Thus, "it is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose." *Miller*, 317 U.S. at 373, 63 S.Ct. 276; *see also Alabama Power Co.*, 311 F.3d at 1368 ("The Supreme Court has remained steadfast in its resistance to a rigid rule for determining just compensation."). For example, it may be appropriate to base just compensation on the cost of replacing the property, less depreciation, *see United States v. Benning Housing Corp.*, 276 F.2d 248, 250 (5th Cir.1960), at least where market value is not ascertainable. *See United States v. 50 Acres of Land*, 469 U.S. 24, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984). Courts have also sanctioned a "capitalization-of-income" approach, under which "the estimated net return over the estimated life of the improvements is capitalized at a rate which will provide for the recapture or amortization of the value of or investment in improvements, sometimes termed depreciation, as well as a proper return to the investor." *United States v. Tampa Bay Garden Apartments, Inc.*, 294 F.2d 598, 607 (5th Cir.1961); *see also City of Thibo-*

daux v. Louisiana Power & Light Co., 373 F.2d 870, 872–74 (5th Cir.1967). Nonetheless, because comparable sales are generally considered the best evidence of market value, where a sufficient number of such sales can be found, it may be improper to resort to alternative methods of valuation. See 320.0 Acres of Land, 605 F.2d at 821; see also United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Counties, Pa., 441 U.S. 506, 511–17, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979); 50 Acres of Land, 469 U.S. at 27–30, 105 S.Ct. 451; cf. Florida Rock Indus., Inc. v. United States, 18 F.3d 1560, 1567 (Fed.Cir.1994) ("[Where t]he uncontroverted evidence of an active real estate market compels the conclusion that the typical 'willing buyer-willing seller' requirement of fair market value ha[s] been met; it would be inappropriate for a court to substitute its own judgment of value for that of the market.").

While neither the Supreme Court nor our court of appeals appears to have directly addressed the use of the lot method to value land, courts generally acknowledge that it may be appropriate in some cases. See United States v. 100 Acres of Land, More or Less, in Marin Cnty., State of Cal., 468 F.2d 1261, 1265–66 (9th Cir. 1972); United States v. 47.3096 Acres, etc., in Oxford Twp., Erie Cnty., State of Ohio, 583 F.2d 270, 271–72 (6th Cir.1978); United States v. 147.47 Acres of Land in Monroe Cnty., Penn., 352 F.Supp. 1055, 1060–61 (M.D.Pa.1972); City of Bristol v. Tilcon Minerals, Inc., 284 Conn. 55, 931 A.2d 237, 250–51 (2007); Clifford v. Algonquin Gas Transmission Co., 413 Mass. 809, 604 N.E.2d 697, 702–04 (1992); Ramsey County v. Miller, 316 N.W.2d 917, 922 (Minn. 1982); Lehigh–Northampton Airport Auth. v. Fuller, 862 A.2d 159, 167 (Pa. Commw.Ct.2004). Such approval reflects a recognition that it has long been standard practice for appraisers, developers, and lenders to size up a parcel of land with an eye towards how it might be subdivided considering its potential uses, the associated costs of development and marketing, and the price and speed at which divided lots might sell. See Ramsey County, 316 N.W.2d at 920–21; Dash v. State, 491 P.2d 1069, 1071 (Alaska 1971); R. Duvall and D. Black, The Development Approach to Valuation in Eminent Domain Litigation: Capitalizing on Potential Use, Appraisal Journal, Vol. 68 Iss. 3 (July 2000), available at http://www.freepatentsonline.com/article/Appraisal-Journal/64263567.html.

However, federal courts have often been reluctant to allow the lot method to be used to establish market value where the land has not actually been subdivided, and there has been little or no material preparation or development, rendering projections on subdivision and future sales more speculative, and sufficient sales of comparable undeveloped land exist. See 99.66 Acres of Land, 970 F.2d at 655–56; 47.3096 Acres, 583 F.2d at 272; 158.24 Acres of Land, 696 F.2d at 563–64; Rockies Exp. Pipeline LLC v. Hopkins, 2012 WL 1622532, at *2 (S.D.Ind. May 9, 2012); Algonquin Gas Transmission Co. v. 60 Acres of Land, More or Less, in Brockton, Plymouth Cnty., Mass., 855 F.Supp. 449, 453–54 (D.Mass.1994); United States ex rel. TVA v. Easement & Right of Way Over Certain Land in Catoosa Cnty., Georgia, 123 F.Supp. 886, 887–88 (N.D.Ga. 1954); 158.24 Acres of Land, 515 F.2d at 233 (affirming exclusion of landowner's evidence that land could have commanded higher prices if it were subdivided into "small rural tracts held, for example for recreational or residential purposes" where such subdivision was "speculative"); In re Vallambrosa Holdings, LLC, 411 B.R. at 908–09; Norman v. United States, 63 Fed.Cl. 231, 270–71 (2004), aff'd, 429 F.3d 1081 (Fed.Cir.2005); United States v.

*Hickey,* 360 F.2d 127, 137 (7th Cir.1966). That is also generally consistent with the view articulated by a leading treatise:

Determining the market value presents little problem where the land has actually been subdivided. In that case, there being little speculation as to use, the lots may be valued individually. Where the land is pure raw land, with no improvements at all having been made, but there was a showing of adaptability for subdivision purposes, valuation will generally be on a whole subdivision basis. The real problem arises where the condition of the land is in neither of these two extreme states. When the land is at some mid point between raw land with no action toward subdivision taken, and a realized or nearly realized subdivision, the cases are in conflict and no clear rules emerge. The cases are decided on their particular facts, giving weight to the surrounding circumstances involved in the particular case.

4 *Nichols on Eminent Domain* § 12B.14[1], at 12B–159 (quoted in *Algonquin Gas Trans. Co.,* 855 F.Supp. at 454); *see also Guardian Pipeline, LLC v. 295.49 Acres of Land,* 2009 WL 3335066, at *1 (E.D.Wis. Oct. 14, 2009) ("In most cases, ... the courts have adopted the approach that raw land as such, with little or no improvements or preparation for subdivision, may not be valued as if the land were in fact a subdivision. Thus, the 'lot method' approach to valuation may not be used." (quoting 4 *Nichols on Eminent Domain* § 12B.14[1][a] )); 27 Am.Jur.2d *Eminent Domain* § 544 ("It has been said that while it is proper to show that a particular tract of land is suitable and available for division into lots and is valuable for that purpose, it is not proper to show the number and value of such lots. In other words, it is not proper for the jury in these cases to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact." (footnotes omitted))

 While Defendants maintain that their valuation witnesses are not required to use comparable sales, Defendants notably do not claim that comparable sales do not exist. To the contrary, the experts on both sides have identified ostensibly comparable sales for purposes of estimating the per-acre value of the land immediately before the takings. The Government's expert, Pettey, identified five sales as comparable, noting that those properties, like the subject, were currently being used for agriculture but would be viewed by a purchaser as having long-term potential for residential development. (*See* Doc. 38–15 at 11–30, Doc. 38–16 at 1–5). From those sales, Pettey opines that the Moores Mill property had a value of $7,500 per acre before the taking. (*Id.*) Likewise, Defendants' expert, Maddox, points in his report to one of Pettey's cited sales and seven others [8] he considered comparable in fixing the pre-taking value of the subject tracts at $12,000 per acre.[9] (*See* Doc. 38–2 at 32; *see also* Maddox Dep. at 33, 131–43). That comparable sales exist to estimate the value of the undivided land weighs against allowing use of the lot method, which relies upon layers of hypothetical assumptions regarding the prospects, costs, and timing of subdivision, development, and sales of multiple lots in an uncertain future. *Cf. 50*

---

**8.** Maddox's report actually identifies nine properties for purposes of comparison. (Doc. 38–2 at 32). However, the price for one of those was merely an offered listing, not a sale. (Maddox Dep. at 138).

**9.** Maddox also prepared a separate appraisal on the Moores Mill property in 2012 (see Docs. 38–5, 38–6, 38–7), in which he also used seven property sales as comparables. (Doc. 38–6 at 13–22; Doc. 38–7 at 1–12).

*Acres of Land,* 469 U.S. at 36 & n. 23, 105 S.Ct. 451 (disallowing cost of a substitute facility as the measure of just compensation where market value for the property could be determined from comparable sales and "subjective elements in the formula for determining the cost of reasonable substitute facilities would enhance the risk of error and prejudice"); *Atlantic Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1167 (10th Cir. 2000) ("While expert testimony based on hypothesis can (and sometimes must) be used to establish market value, courts tend to prefer evidence derived from actual sales.").

Also counseling against allowing the lot method is that fact that the assumptions underlying the witnesses' lot method calculations are largely speculative given that Defendants have not actually subdivided, improved, or sold any of the land, including areas of the remainders that Defendants do not specifically claim have been materially damaged by the takings. When Defendants acquired the properties in 2007 they certainly had in mind transforming it into a comprehensive residential subdivision, and with a recently-booming real estate market, the prospects for such development appeared bright. In the next year or so, Defendants proceeded with some preliminary planning that resulted in a number of proposed layouts, analyses, and projections, and they entered into a sewer service agreement. Unfortunately for Defendants, the recession and the burst of the housing bubble in 2008 brought their plans to a screeching halt. No lots were ever staked out. No subdivision plat was ever recorded in the probate court or submitted to the County Planning Commission for approval, as would be required to sell any lots. No sewer, water, or electricity connections or other improvements exist. No payments were ever made under the sewer service agreement, and the provider

has since gone out of business. Enfinger also recounts having discussions in 2011 and 2012 with three different homebuilding companies about possibly purchasing multiple residential lots, but those talks admittedly went nowhere. (Enfinger Dep. at 104–08). "Even when the landowner faced with condemnation of his property had taken action aimed at subdividing the condemned land, such as mapping the planned subdivision or contracting to install utilities, where such action has fallen short of altering the physical face of the land, most of the cases collected have held that evidence of a proposed or possible subdivision was inadmissible when offered to establish the number or value of each of the hypothetical lots." J.D. Perovich, Annotation, *Admissibility of Evidence of Proposed or Possible Subdivision or Platting of Condemned Land on Issue of Value in Eminent Domain Proceedings,* 26 A.L.R.3d 780 (1969); *see also United States v. 633.07 Acres of Land, More or Less, in Huntingdon Cnty., Com. of Pa.,* 362 F.Supp. 451, 453–54 (M.D.Pa.1973) ("The court exercised its discretion to exclude the plan because it was drawn up in 1961, was never recorded, and was speculative in nature inasmuch as the landowner, after the expiration of a number of years, had only staked out the outer perimeter of the subdivision and cleared very little of the land.").

 Pointing to the land swap with the BOE in late 2011 that facilitated the construction of a grammar school next to the Fanning tract, Defendants emphasize that they continued throughout the recession to plan to develop or sell the properties as lots in a residential subdivision prior to the takings. Defendants maintain that, given those plans, and that their witnesses have factored costs into their calculations, the lot method is permissible to value the property. However, use of the lot method

cannot be justified based upon a landowner's inchoate plans, intentions, or profit expectations for the land. *See Rockies Exp. Pipeline LLC*, 2012 WL 1622532, at *3 ("[W]here the testimony strays toward a showing of what the landowner intended to do with his land and the profits he intended to make, the evidence is not permitted."). In the end, whatever plans Defendants may have, they have done nothing concrete towards actually subdividing, improving, or selling the land as a residential development. Rather, nine years after the Development Agreement was signed and more than a year-and-a-half after the takings, all that exists is a "paper subdivision," *99.66 Acres of Land*, 970 F.2d at 655, based on informal layouts that have remained in limbo since being created in or before early 2008 and an unrecorded plat that Defendants appear to have commissioned during or in anticipation of this litigation. (*See* Doc. 38 at 5 n.2; Enfinger Dep. at 112–13).

 Defendants next maintain that the lot method is appropriate because, in addition to their plans, the evidence also supports that the highest and best use of the tracts includes future potential as a residential subdivision. The court assumes that the evidence does lend itself to that inference. Indeed, while the while the Government seems to argue that the prospects for residential development in the near future are too remote to support that such is actually a highest and best use, the record shows that the contrary proposition is all but undisputed. Highest and best use is generally defined as the use that is (1) physically possible, (2) legally permissible, (3) financially feasible, and (4) results in the maximum profit. *See Lost Tree Vill. Corp.*, 787 F.3d at 1118; *National Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1067 (9th Cir.2010). Maddox, Enfinger,

and Warren all opine that the highest and best use of the land includes residential development in the reasonably near future. The Government does not contest that Maddox qualifies as an expert given his education, training, and experience as a certified appraiser. And between their status as landowners and that they also undisputedly each have decades of professional experience in which they have successfully bought, sold, and developed residential and commercial real estate in the area, they appear qualified to testify to opinions on the value of the land generally, including as it relates to its highest and best use. There is also substantial evidence supporting the opinions of Defendants' witnesses that the land's highest and best use at the time of the taking included residential development. In particular, it is not disputed that the land is physically adaptable for that purpose, nor are there claimed to be any significant legal obstacles, given that there are no zoning laws or regulations coving the area. Further, despite the Government's characterization of the land as being "located in a rural area" (Doc. 38 at 5), a substantial number of homes and subdivisions were already present in the surrounding area, just to the west and to the northeast of the Fanning tract and to the south, the southwest, and the southeast of the Moores Mill tract. (*See generally* Doc. 38–2 at 14, 24). Defendants' witnesses also highlight that the prospects for residential development were improved by the fact that a new intermediate school was being built, and has since been completed, next to the Fanning tract, and another elementary school was less than half-mile from the southern border of the Moores Mill tract. And finally, MMC had entered into the Development Agreement with the specific intent of developing the land as a residential subdivision, and Defendants took a number preliminary steps in that direction, includ-

ing creating proposed site layouts, construction schedules, and financial analyses. Even though the burst of the housing bubble forced Defendants to put those plans on hold, such evidence tends to support that the land is adaptable for their intended purpose.[10]

■ But perhaps more to the point, to say that a given use is a highest and best one simply connotes that a reasonable purchaser on the date of the taking would have considered that use sufficiently available and likely in the future as to be a material consideration in deciding how much to pay for the land. *See Whitehouse Hotel Ltd. P'ship v. CIR*, 615 F.3d 321, 335 (5th Cir.2010) ("The key inquiry [in deter-

mining highest and best use] is what a hypothetical willing buyer would consider in deciding how much to pay for the property." (citing *320.0 Acres*, 605 F.2d at 781)); *Olson*, 292 U.S. at 255, 54 S.Ct. 704 ("The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered ... to the full extent that the prospect of demand for such use affects the market value while the property is privately held."); *Atlantic Coast Line R. Co. v. United States*, 132 F.2d 959, 964 (5th Cir.1943) (recognizing that, although the case involved an "undeveloped property in a state of nature," "speculative elements [regarding potential future uses] are ... proper to consider if

10. The Government has moved to exclude opinions by Maddox, Warren, and Enfinger to the effect that the Development Agreement increases the value of the properties or informs their highest and best use. (Doc. 38 at 31–33). The Government emphasizes that the Development Agreement is merely a purchase contract between MMC and third parties who previously owned the Moore's Mill tract and that, as such, it is "legally irrelevant to the just compensation determination." (Id. at 32). The court agrees that a purchaser from Defendants would not be bound by the Development Agreement and that MMC's contract rights therein are not compensable under the Takings Clause. *See United States v. 1.604 Acres of Land, More or Less, Situate in City of Norfolk, Va.*, 844 F.Supp.2d 668, 682 (E.D.Va. 2011); *Kaiser Dev. Co. v. City & Cnty. of Honolulu*, 649 F.Supp. 926, 934–35 (D.Haw. 1986) *aff'd*, 898 F.2d 112 (9th Cir.1990). Despite that, the Development Agreement is relevant. First, it embodies the price of the most recent sale of the Moores Mill tract. While the Fifth Amendment does not entitle a condemnee to his acquisition cost, evidence of such cost may be admitted and considered by experts as shedding light on market value at the time of the taking, provided the purchase was not too remote in time. *United States v. 2,353.28 Acres of Land, More or Less, in Brevard & Volusia Counties, State of Fla.*, 414 F.2d 965, 972 (5th Cir.1969); *Jayson v. United States*, 294 F.2d 808, 810 (5th Cir.1961). While MMC entered into the Development

Agreement about seven years before the taking, by which time market conditions had changed, the court is inclined to admit evidence of the price Defendants paid as probative of market value. In addition, the Development Agreement and the steps Defendants took in connection therewith also have a tendency to show that the highest and best use includes residential development. While Defendants plans for the land do not themselves establish highest and best use, "the intention of an owner in purchasing a property and the completion of preliminary steps in the development of the property can remove the matter of highest and best use from the realm of conjecture and speculation into reality." *King v. W. Penn Power Co.*, 946 A.2d 184, 189 (Pa.Commw.Ct.2008) (citing 4 *Nichols on Eminent Domain* § 12B.14[3] ). Similarly, the Development Agreement indicates that, a few years prior to the takings, Defendants' principals, who the Government acknowledges are seasoned land developers, had viewed the land as ripe for a large residential subdivision. That would inform the probability that a reasonable purchaser would have likewise factored that potential into a bid for the land at the time of the taking. *Cf. Buhler*, 305 F.2d at 329 ("[T]he fact that the owners of the fee had, [two years before the taking], subjected the property to a lease for twelve years for rice culture is compelling evidence that they considered this the highest and best use for the property at that time.").

they do in fact influence the value at the time enquired about"). And on that score, even the Government's expert recognizes that a purchaser would have considered the potential for residential development in making a bid on the land in this case. (*See* Doc. 38–16 at 5, 17).[11]

 Nonetheless, a "distinction is to be observed between what land may be worth in the future and what it is now worth in view of the future." *Slattery Co.*, 231 F.2d at 46 n. 11. While the highest and best use of land may include adaptability for a residential subdivision, that does not itself imply that lot method may automatically be used to calculate the value of land at the time of the taking. *See Algonquin Gas Trans. Co.*, 855 F.Supp. at 453 (recognizing that whether "the land as a whole can be valued on the basis of its potential use as a residential subdivision" is a "related but analytically distinct" issue from whether "valuation may be on the basis of the so-called 'lot' method"); *147.47 Acres of Land*, 352 F.Supp. at 1060 ("It may well be that even though the highest and best use of a property is for a residential subdivision, if no meaningful steps have been taken in that direction, viz., construction expenses and actual lot sales, then a 'lot method' appraisal . . . would be inappropriate."); *158.24 Acres of Land*, 696 F.2d at 563 ("We are mindful that the government testimony is that the highest and best use of the property is for recreational or other housing and we are aware that the record reflects that in 1976 Felsenthal to some extent was growing in popularity, but . . . the evidence simply is insufficient to show any such demand for lots as would justify, without more, a valuation based entirely upon "lot method" or square footage computation."); 4 *Nichols on Eminent Domain* § 12B.14[a] ("Where the land is pure raw land, with no improvements at all having been made, but there was a showing of adaptability for subdivision purposes, valuation will generally be on a whole subdivision basis" rather than as individual lots). The lot method effectively values a parcel of land, even if undivided and unimproved, virtually as if it has *already* been subdivided and sold. Such a valuation calculation, the court concludes, requires a more than just that a hypothetical purchaser at the time of the taking would consider development potential; it generally requires that landowner demonstrate that subdivision of the unimproved land was reasonably certain in the near future at the time of the taking. *See 99.66 Acres of Land*, 970 F.2d at 655–56; *Algonquin Gas Transmission Co.*, 855 F.Supp. at 453–54; *Easement & Right of Way Over Certain Land in Catoosa Cnty., Georgia*, 123 F.Supp. at 887–88; *In re Vallambrosa Holdings, LLC*, 411 B.R. at 908–09. The record does not bear out that such was the case here. Rather, the substance, scope, and timing of Defendants' proposed subdivision plans and lot sales remained largely speculative at the time of the takings. As a result, in conjunction with the existence of comparable sales, the court concludes that use of the lot method is not appropriate to value the land based on the lost value of the 28 hypothetical residential lots. The Government's motions in limine are due to be granted to the extent they seek to preclude Maddox,

11. That the land's highest and best use includes the potential for residential development also underlies Pettey's opinion about lost value to the Moores Mill tract as it relates to the cost of constructing two access points across the easement, which Pettey believes a purchaser would view as necessary for future residential development. (Doc. 38–16 at 12, 19–20). Likewise, a presumption of a highest and best residential use also underlies Pettey's analysis of the potential diminution in value as it would relate to future residential lots backing up to power lines on the easement. (Doc. 38–16 at 22–29, Doc. 38–17 at 1–21).

Warren, and Enfinger from testifying to opinions using the lot method to assign value the 28 hypothetical residential lots on an individual basis.

### E. Evidence and Opinions Related to the "Commercial Corner"

Defendants emphasize that the easement on the Moores Mill tract runs directly over a proposed 5.22–acre "commercial corner" lot by the intersection of Moores Mill Road and Steger Road. Maddox, Enfinger, and Warren maintain that the taking of the easement has prevented the development or sale of a lot for that purpose and has thereby diminished the value of the Moores Mill tract by the amount that Defendants say they would have received in a sale of the individual lot. Maddox opines that such a transaction would have yielded $65,000 per acre, or about $340,000, while the Enfinger and Warren claim it would have fetched $100,000 per acre, or $522,000. The Government moves to exclude these opinions, contending that they are founded upon unsupported assumptions regarding both highest and best use and speculation that an individual 5.22–acre lot would be subdivided and sold at a certain price.

█ In support of its position, the Government first raises a sub-argument related to the admissibility of certain testimony that Defendants would use in aid of their commercial corner opinions. The Government contends that Defendants' witnesses' "primary reason" for valuing the 5.22 acres based on commercial use "is a single 'inquiry' or 'overture' received by one of the landowners from an undisclosed retail developer." (Doc. 38 at 24 (footnote omitted)). In particular, Warren related at his deposition that, sometime after the land swap with the BOE in late 2011, he had several conversations with a certain real estate broker he knew who expressed interest on behalf of a client with regard to purchasing land at the southwest corner of the Moores Mill tract. (*See* Doc. 38–12, Deposition of Bland Warren ("Warren Dep."), at 100–115). Warren stated that the broker said that his client was "very interested and that it would be a neighborhood retail development." (*Id.* at 107). Warren admits that the broker never identified who his client might have been, Warren says, however, that based on his "reading between the lines," considering the "nature of" the broker's inquiries, and having "looked [the broker] in the eye," he suspected that the potential purchaser was a local commercial developer that the broker had represented on other occasions and who had developed numerous Dollar General discount retail stores. (*Id.* at 104–06). Warren further admits that the broker never communicated any kind of formal offer (*id.* at 112), but he indicated that a price of "a hundred thousand dollars an acre .... would not prohibit the transaction from happening." (*Id.* at 107). Warren further recounts that when he notified the broker that TVA had advised Defendants of an impending plan to take a power line easement, discussions with the broker ceased. (Warren Dep. at 108). The Government argues that Warren's above testimony is akin to evidence of an unaccepted offer and is inadmissible to show the land's value or that its highest and best use included commercial retail development. (Doc. 38 at 24–25). As a result, the Government contends, that the opinions offered by Enfinger, Warren, and Maddox on the commercial corner are due to be excluded because they are allegedly based on Warren's account of the broker's inquiry. (Id.)

█ At first blush, "[o]ffers made by buyers to owners would appear to be [competent] to show the value was at least equal to the offers." *Atlantic Coast Line*

*R. Co.*, 132 F.2d at 963. "It is clear as a general rule," however, that "unaccepted offers are improper evidence by which to estimate value." *University Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 545 (5th Cir.1974) (footnote omitted); *see also Atlantic Coast Line R. Co.*, *supra*. The former Fifth Circuit has so held in a host of condemnation cases in which a landowner sought to introduce evidence of an unaccepted offer. *See Jayson v. United States*, 294 F.2d 808, 809–10 (5th Cir. 1961); *United States v. Playa De Flor Land & Imp. Co.*, 160 F.2d 131, 136 (5th Cir.1947); *St. Joe Paper Co. v. United States*, 155 F.2d 93, 98 (5th Cir.1946); *United States v. Dillman*, 146 F.2d 572, 575 (5th Cir.1944); *Certain Parcels of Land in Rapides Parish, La.*, 149 F.2d at 82 n. 4. Further, that court has indicated that such offers may be so unreliable that it may be error for an expert to base his opinion thereupon or to reference them in trial testimony. *See Smith*, 355 F.2d at 811–14 (holding to that effect with respect to unexercised options to purchase land, which the court likened to unaccepted offers); *cf. Atlantic Coast Line R. Co.*, 132 F.2d at 963 (affirming exclusion of expert opinions apparently based largely upon asking price not accepted). "The clearest statement of the rationale for excluding this evidence appears in *Sharp v. United States*, 191 U.S. 341, 348–49, 24 S.Ct. 114, 48 L.Ed. 211 (1903):

> 'It is, at most, a species of indirect evidence of the opinion of the person making such offer as to the value of the land. He may have so slight a knowledge on the subject as to render his opinion of no value, and inadmissible for that reason. He may have wanted the land for some particular purpose disconnected from its value. Pure speculation may have induced it, a willingness to take chances that some new use of the land might, in the end, prove profitable. There is no opportunity to cross-examine the person making the offer, to show these various facts. Again, it is of a nature entirely too uncertain, shadowy, and speculative to form any solid foundation for determining the value of the land....'

*University Computing Co.*, 504 F.2d at 545–46; *see also United States v. Regents of N.M. Sch. of Mines*, 185 F.2d 389, 391 (10th Cir.1950) ("The primary reasons underlying the rule are that evidence of that kind is often speculative, usually no opportunity is offered for cross-examination of the persons said to have made the offers, and collateral inquiries are injected into the case which may tend to confuse the main issue."). Further, as suggested by the rationale set forth in *Sharp*, an offeree's testimony regarding such an offer may also be inadmissible on hearsay grounds. *See Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508, 511 & n. 3 (5th Cir.1974); *see also University Computing Co.*, 504 F.2d at 546 (noting that the rule of *Sharp* has been consistently applied where "the offers came from third parties, frequently unidentified, and were merely hearsay"); *Keener v. Sizzler Family Steak Houses*, 597 F.2d 453, 458 (5th Cir.1979) (holding that district court erred by fixing fair market value of restaurant franchise for purposes of awarding damages for breach of contract based on hearsay offer to purchase franchise).

The Government contends that Warren's testimony about receiving an inquiry from the broker is inadmissible to show value under *Sharp* and its progeny. Defendants respond by noting that *Sharp* suggests that an unaccepted offer may be admissible to prove value when it is shown to have been "an honest offer, made by an individual capable of forming a fair and intelligent judgment, really desirous of purchasing, entirely able to do so, and to give the amount of money mentioned in the offer."

(Doc. 41 at 50 (quoting *Sharp*, 191 U.S. at 349, 24 S.Ct. 114)); *see also University Computing Co.*, 504 F.2d at 545–46. Even accepting that premise, however, the existence of such circumstances are not supported by Warren's testimony. He claims that the broker said that he had a client interested in developing a retail commercial space at the corner of the property and informally conveyed the client's willingness to pay $100,000 per acre for some unspecified amount of land. That testimony is hearsay to the extent offered to prove the truth of inferences arising from the broker's statements, including as it relates to the value of the land. *See Emmco Ins. Co.*, 492 F.2d at 511 & n. 3. Warren also admits that the broker never made a formal offer to purchase any amount of land nor disclosed the identity of his client. While Warren has identified the broker by name and he believes that broker's client was a certain developer with a history of working with Dollar General, that suspicion is unduly speculative. Indeed, there is no competent, non-hearsay evidence before the court that there was, in fact, *any* potential purchaser behind the scenes. If statements purporting to be an offer to purchase are generally inadmissible to prove value, that is true *a fortiori* of the shadowy, indefinite verbal inquiry here, whose substance falls short of a bona fide offer and is attributed to a purported agent of an anonymous third party, neither of whom, as far as the court has been made aware, is available for cross-examination. *See Missouri Baptist Hosp. v. United States*, 555 F.2d 290, 298 (Ct.Cl.1977). Thus, testimony by Warren about the broker's allusion to his alleged client's willingness to pay $100,000 an acre is inadmissible to prove value.

 Defendants fall back argument is that Warren's testimony is admissible because it is not offered to prove value *per se*

but, rather, only to support that demand existed for part of the land as a future commercial retail space, thereby tending to show that was a highest and best use. The Government argues that such is a distinction without a difference. Strictly speaking, Warren's testimony about what the broker told him is hearsay regardless of whether it is offered to establish the bona fides of either the amount of the offer or the interest of the broker or his alleged principal regarding a particular purpose for the land. *See Emmco Ins. Co.*, 492 F.2d at 511 & n. 3 (holding that testimony by offeree that salvage broker offered to buy cargo of frozen french fries for 40% of invoice value was hearsay where offered to show the truth of any inference that "an offer was, in fact, made, or that the cargo was worth 40% of its invoice value" or that the french fries had "value as a food product, i.e., are edible"). Nonetheless, in giving their opinions, experts are authorized *to consider and at times reference* evidence that is hearsay or that would otherwise be inadmissible as independent evidence. *See* FED. R. EVID. 703, 705; *Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541, 545 (5th Cir.1978); *see also Smith*, 355 F.2d at 810; *International Paper Co. v. United States*, 227 F.2d 201, 208–09 (5th Cir.1955). Further, courts in condemnation cases have been somewhat more flexible in allowing witnesses to relate the existence, though typically not the amount, of offers and inquiries by third parties about the land for the purpose of supporting the existence of demand for the land generally or for some prospective use, even though such matters hew closely to market value. *See United States ex rel. TVA v. 72.0 Acres of Land, More or Less, in Monroe Cnty., Tenn.*, 425 F.Supp. 929, 938 n. 3 (E.D.Tenn.1976); *Playa de Flor Land & Imp. Co. v. United States*, 70 F.Supp. 281, 363, 366 (D.C.Z.1945), judgment modified, 160 F.2d 131 (5th Cir.1947); *Lehigh–*

*Northampton Airport Authority v. Fuller,* 862 A.2d 159, 168 (Pa.Commw.Ct.2004); *Whitcomb v. City of Philadelphia,* 264 Pa. 277, 107 A. 765, 767 (1919) (quoted in *Blessing v. United States,* 56 F.Supp. 870, 871 (M.D.Pa.1944); *Utah Dep't of Transp. v. 6200 S. Associates,* 872 P.2d 462, 466 (Utah Ct.App.1994); *Commonwealth v. Turner,* 497 S.W.2d 57, 59–60 (Ky.App. 1973); *City of St. Louis v. Vasquez,* 341 S.W.2d 839, 848 (Mo.1960); *cf. United States v. 1,291.83 Acres of Land, More or Less, in Adair & Taylor Counties, Com. of Ky.,* 411 F.2d 1081, 1083–84, 1086–87 (6th Cir.1969) (holding district court erred in refusing to consider evidence of potential for residential development of land abutting on roads where the evidence offered, which included testimony by the landowner "that he had received several inquiries as to whether he would be willing to sell parcels of his farm [along the road frontage] for residential purposes," indicated a demand for such homesites) (cited in *320.0 Acres of Land,* 605 F.2d at 816 & n. 122). It may thus be proper for Defendants' witnesses to reference the fact of the broker's inquiry in order to support opinions that the highest and best use of at least that portion of the property includes commercial retail development.

Further, even absent the broker's inquiry, the court concludes that it may be permissible for Defendants' witnesses to testify to opinions that the highest and best use of the corner intersection of the Moores Mill tract included commercial retail development. Enfinger and Warren have experience identifying, buying and selling, and developing commercial real estate in the area, and Maddox has experience appraising such property. They have generally offered that, despite the lack of commercial development in the immediate area beyond a daycare and a gas station, the corner of the Moores Mill tract is an attractive site for future commercial retail

development because: (1) there are existing subdivisions and residential developments nearby; (2) intersections tend to be more favorable locations for commercial development; (3) the southwest corner of the Moores Mill property is on a county road at an intersection between the newly-built intermediate school next to the Fanning tract and another nearly elementary school and between those schools and existing residential developments; (4) there has been an increase in traffic at the corner of the Moores Mill tract due to the above conditions, which is the primary driver of demand for commercial development; (5) there are no zoning or other significant legal impediments; and (6) there is substantial potential for residential development of the subject tracts themselves in the reasonably near future, which would further increase local traffic.

The Government contends that such reasoning is unduly speculative because Enfinger has suggested that residential development in an area tends to precede commercial development (*see* Enfinger Dep. at 194–95) and, the Government maintains, even "a market for residential development does not [yet] exist, [so] Defendants should not be compensated for a use that will not come to fruition without it." (Doc. 38 at 26). However, Enfinger's testimony on the conditions for and progression of different types of development does not purport to be nearly so definitive as the Government would imply. Further, as discussed previously, even the Government's expert acknowledges that a hypothetical purchaser at the time of the takings would have priced the Moores Mill and Fanning tracts in light of their potential for future residential development. The Government also complains that Defendants' witnesses have not conducted any traffic study or relied on county traffic count records. However, such alleged in-

firmities go only to the weight of these opinions rather than their admissibility. In the end, the court concludes that there is a sufficient, reasonable basis for the jury to consider the opinions of Defendants' witnesses that the highest and best use of the southwest corner of the Moores Mill tract includes the potential for future commercial development.

■ With all of that being said, the court agrees with the Government that the specific opinions of Defendants' witnesses that would award just compensation based on a discrete loss for the commercial corner are not admissible. Again, Maddox proposes that Defendants are entitled to damages in the amount of approximately $340,000 based on an assumption that a 5.22–acre commercial lot would have sold for that sum if priced at $65,000 per acre. Enfinger and Warren use the identical methodology, but they claim a sale would have yielded $522,000, based on their opinion that the property is worth $100,000 per acre for a commercial use. At a fundamental level, these opinions are unreliable and inadmissible for the same reasons cited for the exclusion of the opinions that would value the property just to the north on the easement as if it were subdivided and sold as 28 individual residential lots. Indeed, the approach taken by these witnesses in assigning damages for the commercial corner is but a variation on the lot method, whereby they assume that a 5.22–acre, "29th lot" earmarked for commercial development would have been subdivided

and sold. Again, it is one thing to consider the value of the land taken as if it were part of a larger tract that is adaptable to be subdivided in the future into residential and commercial lots, it is another thing to value the land as if that has already occurred. Here, the property is raw, unimproved land that has not been subdivided, and there is insufficient evidence to support that a 5.22–acre commercial lot was going to be subdivided or sold at the time of the takings. Because specific valuation opinions of these witnesses as to damages for the commercial corner are too speculative, they due to be excluded.[12]

### F. Opinions on Damages for a "Buffer"

The Government also contests the admissibility of opinion testimony by Maddox, Enfinger, and Warren as it relates to lost value to the property for a "buffer area" between the power lines on the easement and any prospective residential development to the east. In particular, Maddox maintains that "there is some stigma associated with power-lines" and that "it is widely believed that the presence of power-lines will reduce the value of residential lots that are encumbered, or even bordered by, when they are in view." (Doc. 38–13 at 6–7). To cure this, Maddox proposes that "providing a buffer between the power-lines and the rear of any potential residential lots of about 225 feet would significantly reduce the diminution of value

---

12. Further, even assuming the viability of the lot method and its application to the commercial corner, another problem exists with these opinions. Unlike with the sales of the 28 hypothetical residential lots, the opinions of Defendants' witnesses on the commercial corner calculate lost value based upon a projected *gross* sale price of the lot, without deducting projected costs, such as for dividing, surveying or other preparation of the raw land, marketing, or closing commissions and

fees. As a consequence, these opinions, as stated, would not be reliable because they do not reflect the purported net loss attributable to an inability to sell the commercial corner. See *47.3096 Acres*, 583 F.2d at 272; *see also Graphic Prods. Distrib., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1580 (11th Cir.1983) (because an antitrust plaintiff may recover only lost net profits, testimony as to company's gross profits would have been subject to exclusion "since, standing alone, it was irrelevant").

to the remainder of the property." (*Id.*) He opines that this buffer, running for 2,466 feet along the length of the easement and comprising a total area of 12.74 acres, has lost all of its pre-taking value, which he found, based on a comparable sales approach, was $12,000 per acre. (*Id.*) This results, Maddox says, in a diminished value to the properties that rounds to $153,000. (*Id.*)

Enfinger and Warren would likewise offer opinions on a buffer and corresponding loss values. (*See* Doc. 38–11 at 6–8, 13, 17). Similar to Maddox, they claim that the land for the first 200 feet to the east of the power line easement has lost all pre-taking value, though they assert such to have been $15,000 per acre. However, to prevent double counting for the loss for the area they earmarked for the 28 hypothetical residential lots, Enfinger and Warren would calculate the loss for this buffer based on an assumption that it is 125 feet wide, rather than 200 feet, and 2,466 feet long. As such, it would comprise an area of 7.08 acres and diminish the value of the land, these witnesses contend, in the amount of $106,147. Enfinger and Warren further claim, however, that the next 350 feet to the east of that "first" buffer comprise a "second" buffer covering 19.81 acres that has also lost 50% of its value, causing a loss of another $148,605. Thus, Enfinger and Warren would opine that the two buffers stemming from the power lines would result in a combined loss to the value of the land in the sum of $254,752.

 It is well established that a landowner may recover severance damages for a diminution in market value of the remaining parcel stemming from the taking of an easement to construct electric power transmission lines and supports. *See United States ex rel. TVA v. Robertson,* 354 F.2d 877, 881 (5th Cir.1966); *Hicks v. United States for Use of TVA,* 266

F.2d 515, 521 (6th Cir.1959). Courts have consistently recognized that some segments of the buying public may view such structures as an eyesore or be apprehensive about the potential for accidental injuries or property damage or for adverse health effects from exposure to electromagnetic fields ("EMFs"). *See Robertson,* 354 F.2d at 880–81; *Hicks,* 266 F.2d at 521; *United States v. 87.98 Acres of Land More or Less in the Cnty. of Merced,* 530 F.3d 899, 904 (9th Cir.2008); *United States v. 760.807 Acres of Land, More or Less, Situated in the City and County of Honolulu, State of Hawaii,* 731 F.2d 1443, 1447 (9th Cir.1984). Further, notwithstanding that such health and safety concerns might appear overstated or even irrational given existing science, to the extent that they might be shown to adversely affect the market value of the remainder, they are proper subjects of consideration in assessing just compensation. *See Robertson,* 354 F.2d at 880–81; *87.98 Acres of Land,* 530 F.3d at 904; *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.,* 80 F.3d 1074, 1078 (5th Cir.1996); *760.807 Acres of Land,* 731 F.2d at 1446–47; *United States ex rel. TVA v. Easement & Right of Way Over a Tract of Land in Madison Cnty., Tenn.,* 405 F.2d 305, 308–09 (6th Cir.1968).

The Government does not appear to dispute these broader legal propositions. Rather, the Government's argument is that the opinions of Maddox, Enfinger, and Warren as they relate to the need for a buffer area, the size thereof, and any purported diminution of value are due to be excluded because they are not based on any market data and are otherwise too speculative and unreliable.

 The court first addresses Maddox's testimony. He posits that "it is common knowledge" and "widely believed" in the real estate business that the presence

of power transmission lines reduces the value of nearby residential property. (*Id.* at 7; Maddox Dep. at 121). When asked how he knows that to be so, he cited a *New York Times* article suggesting generally that people continue to fear that long-term exposure to power lines increases the risk of cancer. (Maddox Dep. at 121; *see also* Doc. 38–13 at 3; Clyde Haberman, *Long After an '80s Scare, Suspicion of Power Lines Prevails,* N.Y. Times, November 30, 2014, available at www.nytimes.com/2014/12/01/health/long-afteran-80s-scare-suspicion-of-power-lines-prevails.html?_r=0). Maddox acknowledged, however, that the *Times* article did not contain any information with regard to how such fears might affect the market value of nearby property. (Maddox Dep. at 121–22). Maddox also alludes to other articles on the subject from the Appraisal Journal, although he was unable to identify the name or any other particulars of such articles, including what conclusions they might have drawn with regard to market value. (*Id.*) On the other hand, Maddox also said that he is aware, based on his observations of the market generally and discussions with multiple, though unspecified, developers, that "lots that back up to power lines are often a tougher sale than other lots" and "are often the last lots sold in a subdivision," thereby increasing the developer's carrying costs. (*Id.* at 123–24). He also stated that he was aware that, in some subdivisions, whose names he was unable to immediately recall, lots backing up to power line easements had sold to builders for as much as other lots and then the builder could not sell the house. (*Id.* at 124).

Maddox's opinions constitute expert testimony, so they are subject to FED. R. EVID. 702 and *Daubert.* Maddox's cited general observations about the market and his discussions with developers are not an overwhelming foundation for his assertion that power lines reduce the market value of property suitable for residential development. Nonetheless, in light of the fact that courts have for decades acknowledged the seemingly intuitive premise that power lines may diminish the value of residential land in more rural areas, the court will allow Maddox to testify to the existence of such a stigma and that it negatively impacts market values on some general level.

■■ There is a distinction, however, between evidence that a stigma affects market value generally and evidence that seeks to quantify that diminution, especially in a particular case. *See Bradley v. Armstrong Rubber Co.,* 130 F.3d 168, 176 (5th Cir.1997). And as to the latter, the materials before the court fail to demonstrate that Maddox's opinions that attempt to quantify the effect of the power lines on market value are reliable under *Daubert.* Specifically, Maddox claims that all land within 225 feet of the eastern boundary of the easement, or 20 feet beyond the depth of the residential lots he has previously hypothesized, has no market value. Maddox candidly admits, however, that his opinions with regard to these damages are "the most subjective" of his categories assigning lost value. (Doc. 38–13 at 6). He also recognizes that these damages are "difficult to quantify" because "there is little empirical evidence available." (*Id.* at 6–7). Indeed, whatever empirical evidence may exist, Maddox has not cited any of it; he has not pointed any treatise, article, study, sales data, industry practice, or any other particular circumstance supporting that the power lines completely destroy the market value of land otherwise suitable for residential development within 225 feet of the boundary of the power line easement. Further, that conclusion is also generally inconsistent with Maddox's own statement that he is aware that raw residential lots abutting power line easements

have sold to builders for the same price as other lots. Maddox also says that he is relying upon his "experience" generally to support these opinions. (*Id.* at 6; *see also* Maddox Dep. at 121). But while a witness may be *qualified* to testify as an expert based on "experience," when such is baldly offered as the *basis* for an opinion, that is nothing but *ipse dixit*. *See Frazier*, 387 F.3d at 1261. The court concludes that the Government's motions in limine are due to be granted as they relate to Maddox's opinion that land on the remainder of the tracts within 225 feet of the easement has lost all market value and his associated calculations assigning damage based on that assumption. *See Transwestern Pipeline Co., LLC v. 46.78 Acres, More or Less, of Permanent Easement Located in Maricopa Country* (sic), 2010 WL 1728936, at *3–6 (D.Ariz. Apr. 26, 2010) (excluding under *Daubert* severance damages opinions based on the necessity of an 800-foot setback from a gas pipeline because expert provided no empirical data and relied only on experience), *aff'd sub nom. Transwestern Pipeline Co. LLC v. 46.78 Acres of Permanent Easement Located in Maricopa Cnty.*, 473 Fed.Appx. 778 (9th Cir.2012).

Turning to Enfinger and Warren, their opinions on diminished value for a buffer are similar in many respects to those of Maddox. As material here, the opinions of the former two differ in substance from those of the latter only in that Maddox claims that all land within 225 feet of the eastern boundary of the easement has no market value while Enfinger and Warren say that is true for land up to 200 feet, but they further claim that the market value for the next 350 feet is also

diminished by one-half.[13] The Government contends that those opinions by Enfinger and Warren are inadmissible because, like Maddox's, they are based upon speculation rather than on any market data and are thus unreliable. Defendants again respond that such arguments attacking the basis of their opinions necessarily fail given that Enfinger and Warren are deemed owners of the land and thus may testify without further qualification. On that point, the court disagrees with Defendants. While landowners may be qualified to offer lay opinions on the value of land under Fed. R. Evid. 701, the extent to which power transmission lines might impact the market value of adjacent raw land adaptable for future use as a large residential subdivision is not a matter that would appear generally within the knowledge or understanding of lay jurors. Moreover, and as further detailed below, Enfinger and Warren are making appeals that invoke specialized knowledge as the basis for these opinions, gleaned from their many years of experience as real estate developers. (*See* Doc. 38–4 at 4 ("The Principals' testimony will be based on their experience and observations as developers; their familiarity with residential and commercial development markets in Northern Alabama; [and] their familiarity with the process through which such developments are designed, marketed, and sold"); Doc. 38–11 at 5 (stating that the damages calculations of Enfinger and Warren are based upon, among other things, "their experience developing land"); *see also* Warren Dep. at 181–82 (wherein defense counsel asserted that Enfinger and Warren are

---

**13.** The court notes that the buffer-related opinions of Maddox on the one hand and those of Enfinger and Warren on the other also differ in that Maddox estimates the pre-taking value of the land to the east of the easements to be $12,000 per acre while Enfinger and Maddox lay that figure at $15,000 per acre. However, the Government's arguments aimed at excluding the opinions on a buffer are not based on any ostensible unreliability of estimates of pre-taking value.

qualified to offer opinions on diminished value for a buffer regardless of whether they have consulted external data or sources because, counsel said, "These guys are walking, breathing market analyses ... These guys are in the business. That's how they know."). Thus, these opinions of Enfinger and Warren are expert testimony subject to FED. R. EVID. 702 and *Daubert*. Alternatively, even to the extent that their testimony might be viewed as lay opinion, it still cannot be based simply on unstated assumptions or speculation; it has to have some reasonable foundation. And for the reasons set forth below, the court concludes that, similar to Maddox, the testimony recited by Enfinger and Warren affords a sufficient basis to support opinions that power lines have some negative impact on the market value of nearby land generally. But also like Maddox, there is simply too large a gap between their observations from their experience and their opinions that the land at Moores Mill and Fanning within 200 feet of the easement has been rendered worthless and that the land for the next 350 feet has lost half its value.

 First, the only basis that Enfinger expounds for his buffer opinions is his experience as a developer, specifically as it relates to McMullen Cove, a large, gated community located about 10 miles east of downtown Huntsville. (*See* Enfinger Dep. at 157–59, 211–12, 229–256). When Enfinger's group purchased the land for McMullen Cove, it was subject to a 195–foot-wide TVA transmission line easement running through the middle of it [14] (*id.* at 222–24), which he maintains "was a disadvantage to that property." (*Id.* at 253). In support, Enfinger says that people fear

that power lines cause cancer, so when he and his group designed the layout for McMullen Cove between 2004 and 2006, they "backed away from [the easement] in all subdivisions" (*id.* at 252), often placing relatively less expensive homes and the clubhouse common area next to it, and they attempted to shield it with trees where possible. (*Id.* at 242–43, 252–54). Enfinger also claims that, to compensate for the easement, the lots in the nearby Huntleigh and Oakshire subdivisions, although not lower-price, were made "extra deep." (Enfinger Dep. at 239–40; *see also id.* at 250). Finally, Enfinger alleges that "a lot of the lots that backed up to the easement sat and we lost money on them.... They marketed for less money for longer periods of time." (*Id.* at 241). Specifically, he suggests that individual lots on the easement at Huntleigh and Oakshire generally sold for about 10% less than did lots across the street that were not on the easement. (*Id.* at 242). The court concludes that, similar to Maddox, these observations are enough to support Enfinger's opinion that transmission lines negatively affect on some level the market value of property suitable for residential development.

By contrast, though, nothing Enfinger recounts from his experience reasonably supports his opinions that residential land within 200 feet of a transmission line has no market value or that the land for the next 350 feet has lost half its market value. For example, Enfinger now claims that the first 200 feet from a power line easement "can't be used for anything but ... an extra big back yard" (Enfinger Dep. at 158) or perhaps "green space" that "you're not going to sell ... to anybody." (*Id.* at

14. The easement at McMullen Cove was thus almost twice as wide as the 100–foot easements on the Moores Mill and Fanning tracts. The transmission line support structures at McMullen Cove also appear somewhat larger than those on the subject properties. (*See* Enfinger Dep. at 238; Doc. 38–2 at 26–27; Doc. 38–17 at 19–20).

196). As far as his personal experience goes, however, he concedes that his development group at McMullen Cove neither implemented nor suffered the effects of anything like a 200–foot buffer in which no residential lots could be developed or sold. Rather, they, as seasoned developers, bought the property knowing it was subject to the existing TVA easement and then proceeded to create and, more importantly, sell a host of residential lots that backed right up to it. Those included higher-end lots in Huntleigh and Oakshire that sold to builders as raw land for over $100,000 each and then sold at retail, after homes were constructed, for approximately $800,000 each. (*See id.* at 244, 250). Enfinger also admits that, by the time of his deposition in November 2014, all of the lots on the easement in both Huntleigh and Oakshire had been built upon and absorbed by the market. (*Id.* at 251–53). Further, when confronted with sales data, Enfinger acknowledged that some lots on the easement at Huntleigh, most of which appear from the scale on the plat (Doc. 38–17 at 18) to be on the order of a little less than 200 feet wide and about 250 feet deep, were sold to builders for about the same price and during the same time period as similar lots across the street and, in some cases, for more. (*See* Enfinger Dep. 250–51; *see also* Doc. 38–17 at 14, 18). Finally, although Enfinger claims that the lots at Huntleigh were made "extra deep" to serve as a buffer of sorts, he acknowledges those lots were only 50 feet deeper "than a normal lot" (Enfinger Dep. at 240), not the 200 feet he now claims have no value, which would encompass almost the entire area of the row of lots bordering on the easement. And beyond that, Enfinger was unable to say whether those lots were actually deeper than the similar lots across the street that were not on the easement. (*id.*). Indeed, an examination of the plat for Huntleigh (Doc. 38–16 at 25) indicates that the lots across the Street are not materially different in size and that most of the area of the lots on *both* sides of the street are within 550 feet of the easement border. These circumstances belie, rather than support, that the land within 200 feet of the power lines at McMullen Cove had no market value and that the land for the next 350 feet has lost half of its market value.

Nonetheless, Enfinger insists that his "experience [at McMullen Cove] solidifies, not contradicts, [Defendants'] position at Moores Mill [and Fanning]." (Enfinger Dep. at 254). In trying to make that case, Enfinger again claims that the lots on the easement at McMullen Cove sold slower and for less than did lots not on the easement. He further adds that although his group may have sold some lots on the easement and others not on the easement to builders for about the same prices, some builders who purchased lots on the easement later had difficulty selling them at retail, to the point that two builders Enfinger knew "went broke." (*Id.* at 241, 251). As a result, he contends that the initial sales to builders are not necessarily "a completely accurate reflection of the market." (*Id.* at 251). Ultimately, he says that the slower absorption for lots on the easement at McMullen Cove demonstrates that their buffering efforts there were "insufficient." (*Id.* at 256). In hindsight, Enfinger maintains, they "would have planned even more buffers than [they] did," including, he suggests, one of at least 200 feet, like Defendants now propose for the subject properties. (*Id.* at 254–56).

None of these arguments, however, reasonably support Enfingers opinions related to the existence of the 200–foot or 550–foot buffers or the diminished market value he associates with each. It must be kept in mind that the issue as framed is whether and to what extent the *market value* of the

land within a given distance of the easement has been reduced because of the transmission lines, not simply whether Enfinger (or some other developer or individual) might decide to take voluntary measures to create a buffer based on personal assumptions about power lines or how they think the market might view them. Also, a good deal of Enfinger's interpretations and arguments on the issues are subject to doubt. To the extent he relies on broad assertions that builders had trouble turning over lots on the easement after buying them, Enfinger concedes that the builders bought their lots from Enfinger's group soon before the real estate market collapsed (Enfinger Dep. at 246–47), and it would be expected that builders and speculators who bought ahead of the collapse would suffer generally. And again, Enfinger makes no effort to identify *any* data or particular sales to support his assertions that sales of lots on the easement at McMullen Cove took longer and yielded less.

But even assuming his claims about slower absorption are credited, they still fail on their face to support that power lines render land within 200 feet of no market value or land on the next 350 feet diminished by half, either at McMullen Cove or as it might relate to the subject properties. That is, there is no dispute that lots adjacent to the easement at McMullen Cove were within 200 feet of its boundary, with the area of nearly the entirety of each lot in some subdivisions being within that proximity. There is also not question that the lots on the easement admittedly all eventually sold for substantial sums in transactions that are not suggested to have been anything other than voluntary and arms-length. And whether or not those sales of lots on the easement might have been "slower" and/or for some unspecified amount "less" they flatly contradict that the land within 200 feet of the

easement at McMullen Cove had *no* material market value. Likewise, Enfinger's vague assertions that an unspecified number of lots bordering on the easement at McMullen Cove took some unstated period of extra time to sell and/or sold for some unidentified amount less plainly does not reasonably support that the land between 200 feet and 550 feet of the easement was diminished in value by half.

Enfinger also avers that there were "compensating factors" at McMullen Cove that allowed them to ameliorate the adverse effects of that easement, including that when the lots were marketed prior to the collapse of the real estate market, financing was freely available and there was, he says, a strong demand for the attractive "amenities" of an upscale community. (See 100, 229, 250–251). He also hints that such conditions would not be present or as favorable at Moores Mill and Fanning. But even if that is so, all it could logically imply at best is that the lot sales showing value on land adjacent to the easement at McMullen Cove do not necessarily *undercut* Enfinger's opinion that the land within 200 feet of the easement at Moores Mill and Fanning has no material market value or that the next 350 feet lost half their value; it still would not *affirmatively support* either proposition. In the end, Enfinger still has not pointed to even a single instance or example from his experience in which the market value of land appears to have been impacted by its proximity to a transmission line easement in anything like the way he now opines. As a result, the court concludes that Enfinger's opinions on the 200–foot and 550–foot buffers lack sufficient foundation, are unreliable, and are due to be excluded.

Finally, Warren's opinions are the same in substance as Enfinger's and they rest on similar footing. Warren acknowledges that he also has not looked at any sales

data on the impact that power lines have on nearby property. He nonetheless also claims that there is a stigma associated with power lines (Warren Dep. at 166), noting that "mommas don't want their children playing next to [them]" (*id.*) and that "realtors will tell you a property is harder to sell or market next to [them]." (*Id.* at 167–68). He also relates generally that he has long owned some commercial property in Madison, Alabama, of which he has only been able to sell "some, ... at a less[e]r value," a circumstance he attributes to nearby power lines. (*Id.* at 168–69). When it comes to his opinions on the market value lost within the proposed 200–foot and 550–foot buffers, however, Warren does little more than make conclusory statements. As to the former, he simply insists that, within the context of a residential development, land with 200 feet of a power line easement cannot be used other than as "a buffer ... that you can't do anything with" and is therefore worthless at best. (*Id.* at 166). Likewise, when asked to explain why he believes that the land for the next 350 feet has also lost half its value, he offers only that, from within that distance, potential buyers will see the power lines and he assumes that as a result they will pay less, or, alternatively, the developer may still get full price, but it will take longer to do so:

> A. The TVA power lines will certainly be visible up to 350 feet and really beyond 350 feet. This is 350 feet that, as Mr. Enfinger described it and I will do my best here as well, is that is—basically takes in what—where—not saying that you couldn't develop it, but it would be impacted.
>
> And so when you create that 350 foot buffer, it's either going to take more— you may get the same price, but it will take a lot longer. So if you have a longer holding period, your value is diminished on land because you're going

to make less, okay. Or you're going to get a lesser price, okay. Those are the two components.

> But if you had that 350 and it is developed, when you have homes and other things, that does provide, in addition to just the 350 feet, that buffer is— that helps diminish the impact of the TVA line beyond that. And that's what we feel is the area that would be impacted.
>
> Q. Have you done any market analysis to see the impact on values of subdivision lots that have sold within 550 feet of a TVA transmission [line]?
>
> A. No, we have not. And that's not our we approach it. We approach it by it has a visional impact and our buyers are going to go out there and see it. So it's tangible and we know that they're going to have an adverse reaction to it. And so 350 feet gives us—that is basically the width that you can put another street in and put lots on that. So we know for sure they're going to be impacted by it. They're going to see it. It's going to impact those lots.

(Warren Dep. at 179–81).

And while Warren is ostensibly relying upon his experience as a real estate developer for such assertions, he does not offer any specifics or examples from his experience to support them. To the contrary, like Enfinger, when Warren was asked at his deposition about his involvement in developing property by power lines, his testimony tended, if anything, to undercut his opinions that land within 200 feet of the easement has no value or that the half of the value of the next 350 feet has also been lost. First, Warren admits that he has sold property within 200 feet of power lines for commercial development out of his land in Madison. (Warren Dep. at 168–69). As to his experience with resi-

dential property near power lines, Warren cites that he was part of a group that developed Legacy Preserve, a 46–lot subdivision east of downtown Huntsville. (*See id.* at 169–70; *see also* Doc. 38–16 at 24). Warren acknowledged, however, that Legacy Preserve included the development and sale of multiple residential lots within 200 feet of a large TVA power line easement.[15] (Warren Dep. at 170, 176; *see also* Doc. 38–17 at 14, 15). In fact, it is apparent from the scale on the Legacy Preserve plat that the backyards of the lots backing up on the easement actually encroach onto it such that the entirety of those lots is within 200 feet of the easement boundary and that even some small portion of the front yard of the lots across the street appear to be as well. (*See* Doc. 38–16 at 24, Doc. 38–17 at 3). In addition, it is clear that the entirety of those lots across the street are within 550 feet, while such area appears also to extend to cover much of the next row of lots behind *them.* (*Id.*; *see also* Warren Dep. at 177). Accordingly, Warren's group at Legacy Preserve clearly did not experience the effect of his proposed 200–foot buffer, nor is any circumstance cited to support that all land within 550 feet of the easement there lost half of its value because of the presence of the power lines.

When such facts were pointed out to Warren, he did not specifically dispute them but instead sought to dismiss their significance as it relates to Defendants' buffer analysis for the Moores Mill and Fanning properties. First, Warren asserted that, up to the time he divested his interest in Legacy Preserve in about 2010,

the project had not been profitable, which he believed was "in large part due to the TVA easement." (Warren Dep. at 170). In support, he stated that some of the slowest sales at Legacy Preserve were for lots on the easement. (*Id.* at 175–76). Second, he claimed that the power lines are generally less visible at Legacy Preserve than they would be at Moores Mill and Fanning because they have "no vegetation" and "very mild elevation changes," while Legacy Preserve was "heavily, heavily wooded" and "very rolling to hilly to some steep grade in parts of it." (*Id.* at 177–78).

While Warren's observations from his experience at Legacy Preserve can support his opinion that power lines have some negative impact on the market value of nearby residential property generally, they do not support his opinions on the 200–foot and 550–foot buffers at Moores Mill and Fanning. For one thing, Warren's claim that the power lines were the cause of a lack of profitability more broadly at Legacy Preserve is questionable. He admits that the lots there first became available in July 2006, not long before the recession hit and the real estate continued to list for at least the next several years. (Warren Dep. at 173–75). He also recognizes that at least 10 of the lots there, although not within even 550 feet of the easement, have continued to be tough to sell because they were on a steep slope. (Id. at 175–76). And with respect to Warren's assertion that lots on the easement sold more slowly, data in Pettey's expert report suggests that those lots sold at about the same pace and price as similar

15. The easement at Legacy Preserve would appear to be at least as wide as, if not substantially wider than, both the 195–foot easement at McMullen Cove and the 100–foot easements on the Moores Mill and Fanning tracts. (*See* Doc. 38–16, Doc. 38–17 at 3). The easement at Legacy Preserve also has two parallel sets of transmission lines supported by two sets of towers adjacent to each other (*see* Doc. 38–17 at 3, 16, 17), while the easement at McMullen Cove has only one set of lines and towers (*see* Doc. 38–17 at 8, 13, 19, 20).

lots across the street, at least during the first six months or so after they first became available. (*See* Doc. 38–16 at 28, 29; Doc. 38–17 at 2, 3, 14, 15). Even so, Warren still concedes that much of the land within 200 feet of the easement at Legacy Preserve was, in fact, subdivided, developed, and sold as residential lots, thereby establishing that it had substantial market value. And even if one were to accept that the conditions at Legacy Preserve made the lines less visible than they would be at Moores Mill and Fanning, Warren still has not identified any example in his experience in which land otherwise suitable for residential development was treated as if had it no market value because it was within 200 feet of a power line easement. So while Warren's testimony about Legacy Preserve might not necessarily undercut his claim that all land within 200 feet of the easement at Moores Mill and Fanning has no material value, it cannot logically affirmatively support those conclusions either. Likewise, nothing in Warren's observations from at Legacy Preserve show that power lines caused the market value of all land within 550 feet of the easement to be cut in half. So in the end, all that the Warren offers as the basis for his opinions on diminished value within the proposed 200–foot and 550–foot buffers are his beliefs based on general claims of expertise as a real estate developer. As a result, the court concludes, those opinions and calculations lack foundation and have not been shown to be reasonably reliable.

Based on the foregoing, the court concludes that the Government's motions in limine are due to be denied to the extent they seek to preclude Maddox, Enfinger, and Warren from giving testimony that a stigma associated with electric transmission lines negatively affects market value of nearby land on some level. At the same time, the Government's motions are due to be granted as it relates to the more specific opinions of these witnesses to the effect that the land within either 200 or 225 feet of the easement has lost all of its pre-taking market value or that the land between 200 and 550 feet has lost half of its pre-taking market value.

## G. Loan Interest Payments

The final issue for consideration posed by the Goverment's motions in limine concerns proposed testimony by Enfinger and Warren to the effect that Defendants are entitled to recover damages "for interest payments that they have been required to make pending the TVA's final decision as to the location of the transmission lines and pending [Defendants'] receipt of compensation for the damages they have suffered." (Doc. 38–11 at 7; *see also* Enfinger Dep. at 160–63; Warren Dep. at 215–16). Defendants' disclosures peg those interest payments at $432,152 (*id.* at 13), an amount that has presumably increased as this litigation has continued. The Government argues that such an item of damage is not recoverable in a condemnation action, so neither Enfinger, Warren, nor any other defense witness should be permitted to testify about it. (Doc. 38 at 30–31). The court agrees with the Government.

Defendants fail to cite any authority to support their argument that they might recover for additional interest payments on their loans. (*See* Doc. 41 at 57). Defendants claim that they "are not seeking to recover those payments as a development expense" but rather "because they were directly caused by the TVA's actions." (*Id.*) This argument, however, is a non-sequitur. In an eminent domain action, the landowner is entitled to compensation for the reduced market value of his land, as reflected by what a willing buyer would pay in cash to a willing seller. "Considerations that may not reasonably

be held to affect market value are excluded," *United States v. 50 Acres of Land,* 469 U.S. 24, 29, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984) (quoting *Olson,* 292 U.S. at 256, 54 S.Ct. 704); *see also A.A. Profiles,* 253 F.3d at 585; *Southern Amusement Co. v. United States,* 265 F.2d 34, 37 (5th Cir.1959), and "the Fifth Amendment does not require any award for consequential damages arising from a condemnation." *50 Acres of Land,* 469 U.S. at 33, 105 S.Ct. 451; *see also United States v. General Motors Corp.,* 323 U.S. 373, 382, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *United States v. Bodcaw Co.,* 440 U.S. 202, 203, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979) ("[I]ndirect costs to the property owner caused by the taking of his land are generally not part of the just compensation to which he is constitutionally entitled."); *Wheeler v. City of Pleasant Grove,* 833 F.2d 267, 271 (11th Cir.1987) (holding that landowners were not entitled to "additional compensation for lost profits or increased costs of development" occasioned by temporary regulatory taking).

Defendants fail to explain how their additional interest payments amount to anything other than consequential damages that are not recoverable in an eminent domain action. As one district court has explained,

> ■■■ costs ... such as ... interest and closing expenses on the landowner's loan to acquire the property, do not appear to have any connection to a willing buyer's estimate of the price he would pay for the property. The contribution by these costs to the property's value is speculative. To the extent the inclusion of such costs in the valuation is an attempt to collect reimbursement for Defendant's prior investment in the property, the costs are impermissible, as the Fifth Amendment does not guarantee the landowner a return on his investment.
>
> [*United States ex rel. & for Use of TVA*

*v. Powelson,* 319 U.S. 266, 285, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943) ].

*United States v. 15,478 Square Feet of Land, more or less, situate in the City of Norfolk, VA,* 2011 WL 2471586, at *6 (E.D.Va. June 20, 2011); *see also Crosby v. Pickaway Cnty. Gen. Health Dist.,* 303 Fed.Appx. 251, 262–63 (6th Cir.2008) (holding that landowners could not recover "consequential damages" "due to delay" or for the "interest on incurred construction loans, utilities, insurance and real estate taxes" for the period after county agency allegedly effected a regulatory taking by revoking permits previously granted to install sewage system on property). Further, none of the experts, including Defendants' own, suggest that Defendants' obligations to third parties to repay interest on loans to acquire the properties have any bearing on the value of the land to a hypothetical purchaser. Because Defendants cannot recover damages for their loan interest payments, the Government's motions in limine are due to be granted as they relate to testimony and evidence by which Defendants might make an appeal for their reimbursement.

**IV.**

The Government's motions in limine (Doc. 37; Fanning Case Doc. 41) are **GRANTED IN PART AND DENIED IN PART** as set forth above. To summarize, the Government's motions in limine are **GRANTED** as it relates to the exclusion of the following:

(1) opinions by Maddox, Enfinger, and Warren that use the "lot method" to calculate lost value, including that value the land on and adjacent to the easement as if it has been subdivided and sold as 28 individual residential lots;

(2) an opinion by Maddox that would calculate lost value for the commercial corner based on an approach assuming

that a 5.22-acre lot would have been subdivided and sold for approximately $340,000;

(3) opinions by Enfinger and Warren that would similarly calculate lost value for the commercial corner based on an assumption that 5.22-acre a lot would have been subdivided and sold for approximately $522,000;

(4) testimony by Warren to the effect that a broker representing an anonymous principal, that Warren suspected to be a developer that frequently worked with Dollar General discount stores, had indicated a willingness to pay $100,000 an acre for some amount of property at the southwest corner of the Moores Mill tract;

(5) opinions by Maddox that, because of the presence of the power lines, the land within 225 feet of the easement has no market value;

(6) opinions by Enfinger and Warren that the land within 200 feet of the easement has no market value and that land between 200 feet and 550 feet has lost half of its market value; and

(7) opinions or evidence related to interest payments that Defendants have made on their loans to acquire the subject properties, on the theory that Defendants might recover such payments as an element of just compensation.

The Government's motions are **DENIED** in all other respects, including as it relates specifically to the following arguments:

(1) that all opinions by Enfinger and Warren are inadmissible based on an alleged violation of FED. R. CIV. P. 26(a)(2)(B);

(2) that valuation opinions by Maddox, Enfinger, and Warren are inadmissible because they consider damage to separate sections or areas of the tracts;

(3) that opinions by Maddox, Enfinger, and Warren that the highest and best use of the subject properties includes residential subdivision are inadmissible;

(4) that opinions by Maddox, Enfinger, and Warren that the highest and best use of the southwest corner of the Moores Mill tract includes retail commercial development are inadmissible;

(5) that opinions by Maddox, Enfinger, and Warren that the presence of electric transmission lines negatively impact the market value of the subject tracts generally are inadmissible; and

(5) that evidence related to the Development Agreement, including opinions considering it in determining fair market value, are inadmissible.

It is so **ORDERED**, this 21st day of October, 2015.